**No. 25-10774**

IN THE

# United States Court of Appeals
# for the Fifth Circuit

ALTA POWER, LLC,

*Plaintiff–Appellant,*

*v.*

GENERAL ELECTRIC INTERNATIONAL, INCORPORATED,

*Defendant–Appellee.*

On Appeal from the U.S. District Court for the Northern District of Texas,
Dallas Division, No. 3:23-CV-0270-X

## OPENING BRIEF OF APPELLANT
## ALTA POWER, LLC

John B. Lawrence
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
john.lawrence@bakerbotts.com

Michael Cancienne
Joseph W. Golinkin II
JORDAN, LYNCH & CANCIENNE PLLC
1980 Post Oak Boulevard
Houston, Texas 77056
(713) 220-4019
mcancienne@jlcfirm.com
jgolinkin@jlcfirm.com

Aaron M. Streett
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com
beau.carter@bakerbotts.com

*Counsel for Alta Power, LLC*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Aaron M. Streett (counsel for Plaintiff–Appellant)

- Allyson N. Ho (counsel for Defendant–Appellee)

- Alta Power, LLC (Plaintiff–Appellant)

- Andrew P. LeGrand (counsel for Defendant–Appellee)

- Baker Botts L.L.P. (counsel for Plaintiff–Appellant)

- Beau Carter (counsel for Plaintiff–Appellant)

- Bradley G. Hubbard (counsel for Defendant–Appellee)

- General Electric International, Inc. (Defendant–Appellee)

- Gibson, Dunn & Crutcher LLP (counsel for Defendant–Appellee)

- John B. Lawrence (counsel for Plaintiff–Appellant)

- John T. Cox III (counsel for Defendant–Appellee)

- Jordan, Lynch & Cancienne PLLC (counsel for Plaintiff–Appellant)

- Joseph W. Golinkin II (counsel for Plaintiff–Appellant)

- Michael Cancienne (counsel for Plaintiff–Appellant)

Respectfully submitted,

*/s/ Aaron M. Streett*
Aaron M. Streett

i

## STATEMENT REGARDING ORAL ARGUMENT

Under Fifth Circuit Rule 28.2.3, Alta Power submits that the Court would benefit from oral argument in this case because it involves important questions of Texas common law regarding when and how consequential-damages waivers are enforced.

## TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ...................................................................i

Statement Regarding Oral Argument ........................................................ ii

Table of Contents ....................................................................................... iii

Table of Authorities ....................................................................................v

Jurisdictional Statement ..............................................................................1

Statement of Issues......................................................................................1

Introduction .................................................................................................2

Statement of the Case .................................................................................4

I.       Factual Background .........................................................................4

         A.     ERCOT and "Peaker Plants"..............................................4

         B.     GE's Virtual Monopoly on Turbines .................................5

         C.     ProEnergy Creates the Refurbished-Turbine Market...........7

         D.     Alta Needs Refurbished Turbines for its Peaker Plants........8

         E.     GE's TRUEPackage and "Partnership" with WattStock ......8

         F.     WattStock Approaches Alta Claiming to be GE's New Partner for Refurbished Turbines .................................................................9

         G.     Alta and WattStock Sign the Master Agreement ...............10

         H.     GE and WattStock's Ruse Falls Apart ...............................12

II.      Procedural History .......................................................................14

         A.     Lawsuit Between Alta, WattStock, and GE .......................14

B.     Summary-Judgment Proceedings ........................................... 16

Summary of Argument ............................................................................ 17

Standard of Review ................................................................................. 19

Argument ................................................................................................ 20

I.     The district court misread the Alta–WattStock Master Agreement to immunize GE for fraudulent conduct it committed before it became Alta's subcontractor. .............................................................................. 20

     A.     Texas law sets high bars for establishing limitations of liability and third-party-beneficiary status. ................................... 21

     B.     GE was not acting as WattStock's subcontractor when it defrauded Alta through its pre-Agreement actions to induce Alta to sign the Agreement. ........................................................ 27

II.     The district court misapplied Texas law by enforcing a fraudulently induced consequential-damages waiver in favor of a non-party. .................. 34

     A.     Fraud vitiates contracts under Texas law except in rare circumstances. ......................................................................... 34

     B.     The district court misapplied Texas law on how fraud affects damages waivers ............................................................... 37

III.     The district court misread the Master Agreement to limit damages for GE's intentional torts. ......................................................................... 41

Conclusion ............................................................................................. 46

Certificate of Compliance ..................................................................... 47

Certificate of Service ............................................................................ 47

iv

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allright, Inc. v. Elledge*,
  515 S.W.2d 266 (Tex. 1974) ........................................................................22

*Bayou Steel Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
  642 F.3d 506 (5th Cir. 2011) ................................................................28, 29

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*,
  565 S.W.3d 280 (Tex. App.—Dallas 2017) ..................................................38

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*,
  572 S.W.3d 213 (Tex. 2019) .................................................................*passim*

*Catalyst Strategic Advisors, L.L.C. v. Three Diamond Cap, SBC,
  L.L.C.*,
  93 F.4th 870 (5th Cir. 2024) .......................................................................19

*City of Austin v. Powell*,
  704 S.W.3d 437 (Tex. 2024) ........................................................................41

*City of Fort Worth v. Rylie*,
  602 S.W.3d 459 (Tex. 2020) ...................................................................21, 34

*Cunningham v. Healthco, Inc.*,
  824 F.2d 1448 (5th Cir. 1987) .....................................................................27

*Dall. Farm Mach. Co. v. Reaves*,
  307 S.W.2d 233 (Tex. 1957) .........................................................23, 34, 35

*Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*,
  576 S.W.3d 362 (Tex. 2019) ........................................................................22

*Duncan v. Cessna Aircraft Co.*,
  665 S.W.2d 414 (Tex. 1984) ........................................................................25

*El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*,
  389 S.W.3d 802 (Tex. 2012) ........................................................................21

*Finley Res., Inc. v. Headington Royalty, Inc.*,
 672 S.W.3d 332 (Tex. 2023) ........................................................21, 24, 30, 39

*First Bank v. Brumitt*,
 519 S.W.3d 95 (Tex. 2017)..........................................................................26

*First Nat'l Bank of Luling v. Nugent*,
 384 S.W.2d 224 (Tex. App.—San Antonio 1964,
 writ ref'd n.r.e.)..........................................................................................41

*Forest Oil Corp. v. El Rucio Land & Cattle Co.*,
 518 S.W.3d 422 (Tex. 2017) ........................................................................41

*Forest Oil Corp. v. McAllen*,
 268 S.W.3d 51 (Tex. 2008)............................................................23, 25, 33, 35

*FPL Energy, LLC v. TXU Portfolio Mgmt. Co., LP*,
 426 S.W.3d 59 (Tex. 2014)..........................................................................22

*Frost Nat'l Bank v. L & F Distribs., Ltd.*,
 165 S.W.3d 310 (Tex. 2005) ........................................................................43

*Great Hans, LLC v. Liberty Bankers Life Ins. Co.*,
 No. 05-17-01144-CV, 2019 WL 1219110 (Tex. App.—Dallas Mar.
 15, 2019, no pet.) (mem. op.) .....................................................................38

*Great Lakes Ins., S.E. v. Gray Grp. Invs., L.L.C.*,
 76 F.4th 341 (5th Cir. 2023) ........................................................................43

*Hooks v. Samson Lone Star, Ltd. P'ship*,
 457 S.W.3d 52 (Tex. 2015)............................................................34, 36, 40, 43

*In re FirstMerit Bank, N.A.*,
 52 S.W.3d 749 (Tex. 2001)..........................................................................39

*In re La. Crawfish Producers*,
 852 F.3d 456 (5th Cir. 2017) ......................................................................19

*In re Weekley Homes, L.P.*,
 180 S.W.3d 127 (Tex. 2005) ........................................................................39

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
 341 S.W.3d 323 (Tex. 2011) ........................................... 23, 24, 25, 35, 36, 40

*Malouf v. State ex rels. Ellis*,
    694 S.W.3d 712 (Tex. 2024) ................................................................45

*Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*,
    26 F.3d 531 (5th Cir. 1994) ................................................................26

*Morris v. House*,
    32 Tex. 492 (1870)................................................................23

*Phila. Indem. Ins. Co. v. White*,
    490 S.W.3d 468 (Tex. 2016) ................................................................38

*Pub. Util. Comm'n of Tex. v. Luminant Energy Co.*,
    691 S.W.3d 448 (Tex. 2024) ................................................................4

*Rieder v. Woods*,
    603 S.W.3d 86 (Tex. 2020)................................................................21

*Schlumberger Tech. Corp. v. Swanson*,
    959 S.W.2d 171 (Tex. 1997) ................................................24, 25, 35

*S. Methodist Univ. v. S. Cent. Jurisdictional Conf. of the United
    Methodist Church*,
    716 S.W.3d 475 (Tex. 2025) ................................................26, 40

*Talman Home Fed. Sav. & Loan Ass'n of Ill. v. Am. Bankers Ins.*,
    924 F.2d 1347 (5th Cir. 1991) ................................................27, 33

*Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prods. Co.*,
    448 F.3d 760 (5th Cir. 2006) ................................................................28

*Transcor Astra Group S.A. v. Petrobras Am. Inc.*,
    650 S.W.3d 462 (Tex. 2022) ................................................23, 35, 39

*United States v. Throckmorton*,
    98 U.S. 61 (1878)................................................................34

*United States v. Vonn*,
    535 U.S. 55 (2002)................................................................41

*Victoria Bank & Tr. Co. v. Brady*,
    811 S.W.2d 931 (Tex. 1991) ................................................................24

vii

*Vitol, Inc. v. United States*,
   30 F.4th 248 (5th Cir. 2022) ...................................................................25

*Waak v. Rodriguez*,
   603 S.W.3d 103 (Tex. 2020) ..................................................................43

*Wal-Mart Stores, Inc. v. Xerox State & Local Sols., Inc.*,
   663 S.W.3d 569 (Tex. 2023) ..................................................................21

*Wintz v. Morrison*,
   17 Tex. 372 (1856)..................................................................................34

*Zachry Const. Corp. v. Port of Hous. Auth. of Harris Cnty.*,
   449 S.W.3d 98 (Tex. 2014)................................................................42, 44

## Statutes & Rules

FED. R. CIV. P. 56(a) .................................................................................19

TEX. BUS. & COM. CODE § 2.719(c)...........................................................23

TEX. CIV. PRAC. & REM. CODE § 41.003 ....................................................36

## Other Authorities

BLACK'S LAW DICTIONARY (8th ed. 2004) ..................................................28

BLACK'S LAW DICTIONARY (9th ed. 2009) .............................................. 28-29

BLACK'S LAW DICTIONARY (11th ed. 2019) ...............................................29

BLACK'S LAW DICTIONARY (12th ed. 2024) ...............................................22

CORBIN ON CONTRACTS § 580 (1952) .......................................................35

Pursley & Wiseman, *Local Energy*, 60 EMORY L. J. 877 (2011) .............5

RESTATEMENT (FIRST) OF CONTRACTS § 573 (1932)..................................35

RESTATEMENT (SECOND) OF CONTRACTS § 216 cmt. e (1981) ..............24

Scalia & Garner, READING LAW: THE INTERPRETATION OF LEGAL
   TEXTS (2012)....................................................................................21, 45

WIGMORE ON EVIDENCE § 2439 (2d ed. 1923) .........................................35

ix

WILLISTON ON CONTRACTS § 64:21 (4th ed. May 2025) ..........................................22

**JURISDICTIONAL STATEMENT**

The district court had jurisdiction under 28 U.S.C. § 1334.  The district court issued its final judgment on June 12, 2025.  Alta Power timely filed its notice of appeal on June 17, 2025.  This Court has jurisdiction under 28 U.S.C. § 1291.

**STATEMENT OF ISSUES**

1.    Whether the district court misconstrued the Alta–WattStock Master Agreement's consequential-damages waiver for "subcontractors" to cover GE's fraudulent actions, even though GE's fraud occurred *before* the Agreement and preceded GE's status as a subcontractor.

2.    Whether the district court misinterpreted Texas law in enforcing a contractual consequential-damages waiver to immunize non-party GE's fraudulent conduct, despite the Texas law principle that fraud vitiates such waivers outside narrow exceptions.

3.    Whether the district court misconstrued the Master Agreement's consequential-damages waiver to cover intentional torts like fraud.

1

**INTRODUCTION**

Alta Power set out to build power plants to supply electricity to Texans when they need it most—at times of peak demand. These "peaker plants" can be profitable if the conditions are right. Alta's business plan depended on using a certain type of refurbished turbines to generate electricity.

General Electric has a monopoly on the manufacture of these turbines and historically did not sell refurbished ones. GE also secures long-term service agreements with turbine purchasers, and if they later try to sell the turbine, GE charges exorbitant termination fees. With the purchase of a new turbine comes GE's warranty, and without that, banks are very unlikely to back a project.

ProEnergy Solutions set out to establish the "refurbished" turbine market. ProEnergy would buy used turbines, fix up the turbines, and sell them for peaker plants like Alta's. And ProEnergy would provide its own warranty that banks generally accepted. That cut into GE's monopoly, so GE released its own refurbished-turbine product called the TRUEPackage. It then worked with a new company called WattStock to locate, refurbish, and sell the turbines. GE told those in the market that the TRUEPackage would be backed by GE's warranty.

Alta chose GE and WattStock over ProEnergy. That was a costly mistake. As it turned out, GE did not really want to break into the refurbished-turbine market. It wanted to destroy it and re-establish its monopoly on turbines. While GE said it

had a binding partnership with WattStock and would provide its warranty for the TRUEPackage turbines, that was a lie. Relying on GE's misrepresentations, Alta signed an agreement for WattStock to procure turbines. But GE worked behind the scenes to drive up the cost of refurbished turbines. WattStock eventually went bankrupt, and Alta could not acquire the turbines it needed.

When Alta sued GE, GE claimed that Alta's preliminary agreement with WattStock immunized GE's fraudulent conduct in the lead-up to the agreement. Because the agreement's consequential-damages waiver covered the actions of WattStock's "subcontractors," and because GE became WattStock's subcontractor long after Alta and WattStock struck the agreement, GE contended that the waiver retroactively immunized GE's pre-subcontractor conduct.

Perhaps because a state court and a bankruptcy court had already rejected that argument twice, GE devoted just a page of its summary-judgment motion to it. Nevertheless, the district court accepted it. That was error. The district court oversimplified the complex dispute between Alta and GE, fundamentally misconstruing the agreement and flouting the bedrock principle of Texas law that fraud vitiates whatever it touches. This Court should reverse.

STATEMENT OF THE CASE

## I. Factual Background

### A. ERCOT and "Peaker Plants"

Energy on the Texas electric grid is bought and sold through the Electric Reliability Council of Texas—ERCOT. *See Pub. Util. Comm'n of Tex. v. Luminant Energy Co.*, 691 S.W.3d 448, 454 (Tex. 2024). ERCOT oversees the grid and "ensur[es] the reliability and adequacy of the regional electrical network." *Id.* Part of this job is "determin[ing] the market clearing prices of energy." *Id.* To incentivize electricity-generators to provide energy "in times of high demand," ERCOT sets prices higher when demand is at its peak. *Id.* This mechanism discourages people from using energy, thereby ensuring that the lights (and air conditioning) remain on in Texas. *See id.* Texans are familiar with what happens when demand outstrips supply: rolling blackouts, boil-water notices, and braving the extreme temperatures until enough electricity can flood the market to meet demand.

As demand for electricity has skyrocketed over the last decade, aging coal-fired power plants have retired, and Texas has become increasingly reliant on (less predictable) renewable energy. ROA.22945-48. That, plus delays in building "base" generation (*i.e.*, power plants that create the expected amount of electricity to meet demand), has made "peak" events a regular occurrence (*i.e.*, when demand for electricity outpaces the electricity available to meet it). ROA.22698-99;

4

ROA.22945-48.    Texas's electric grid, in turn, has become less reliable. ROA.22945.

The need to supply energy on demand for these peak events led to the rise of "peaker plants."  *See* ROA.22225.  Peaker plants, as the name suggests, run only in times of "peak" demand, providing electricity when demand (and prices) is at its highest.[1]  Because prices for electricity track demand, the rise in peak events created opportunities for substantial profits for peaker plants.  *See* ROA.22945.

## B.    GE's Virtual Monopoly on Turbines

GE builds and sells turbines for power plants.  ROA.21466-49; ROA.22523. GE's LM6000 turbine is frequently used in peaker plants and other types of power plants.  ROA.22716.  While these turbines are quite expensive, banks are often willing to finance their purchase so long as GE provides a warranty that it will assume responsibility if something goes wrong.  ROA.22430-32; ROA.22436-37; ROA.22716.  Without the warranty, banks view the investment as risky, making it practically difficult to buy the turbines.  ROA.22430; ROA.22828-29.  GE's warranty is critical to the value of its turbines.

---

[1] *See* Pursley & Wiseman, *Local Energy*, 60 EMORY L. J. 877, 899-900 (2011) (describing peaker plants as those that "exist only to meet consumer demand for electricity when demand exceeds the normal base load," "power[ing] up during times of 'peak' electricity demand such as hot summer days when air conditioners run at maximum capacity," but "sit[ting] idle" at all other times).

While revenue from the sale of turbines provides one-time profits for GE, it reaps continuous profits through servicing the turbines.  ROA.22523; ROA.22667-68; *see* ROA.21481; ROA.7881.  When a company buys an LM6000, the company typically secures an exclusive service agreement with GE so that only GE (or its few authorized service providers) can provide maintenance on the turbines.  ROA.8747-48; ROA.22587; ROA.22667-68.  Moreover, if the company later determines it is no longer economically viable to run the turbines—say, because maintenance costs exceed revenues—the company cannot just sell the turbines to any willing buyer.  *See* ROA.22758-59.  Instead, under the service agreement with GE, the company must usually pay GE a steep cancellation fee if it opts to sell the turbine and cancel the service agreement.  *See* ROA.22297; ROA.8747-48.  As a consequence, the economical option is often for the company to let the LM6000 sit dormant.  *See* ROA.22523-24; ROA.22569; ROA.7881.

For this reason, used LM6000s were hard to come by in the market.  ROA.22664-65; *see* ROA.22430-31; ROA.22306.  GE sold only new LM6000s and did not market refurbished ones.  ROA.22430-31; ROA.20519.  This state of affairs presented a problem for anyone who wanted to start a peaker plant.  *See* ROA.21560.  New LM6000s were prohibitively expensive for peaker-plant use.  ROA.22430-33; ROA.22715-16.  And even if a company wanted to buy a warranty-less, used LM6000 (that a bank was unlikely to finance), only GE had a list of the dormant

LM6000s.  ROA.22664-65; ROA.22723-24.  The result: Despite the market's need for peaker plants, it was exceedingly difficult to finance them because new, warranty-backed LM6000s were too expensive for peaker plants and refurbished, warranty-less LM6000s were too risky.

### C.    ProEnergy Creates the Refurbished-Turbine Market

ProEnergy Solutions set out to solve that problem in 2016.  ROA.22269. ProEnergy aimed to compete with GE and create a market for refurbished turbines that would be economical for peaker plants, among others.  ROA.22269.  The business model was simple: ProEnergy would buy dormant LM6000s, refurbish the turbines to be "like new," and sell them to peaker plants for roughly half the price of new LM6000s.  ROA.22523.  Critically, ProEnergy would provide its *own* warranty, and banks were willing to finance LM6000 purchases backed by ProEnergy's warranty.  ROA.21600; ROA.22269; ROA.22838.  The next buyer would then get a like-new turbine with a ProEnergy warranty for a fraction of the price of a new one.

ProEnergy also went a step further than GE.  While GE sold only the new turbines, ProEnergy provided a "turnkey" service.  ROA.21600.  That is, it sold the refurbished turbines *plus* gas metering, emission controls, cabling, and all the other technical necessities that went into building and operating a peaker plant. ROA.21601.  By analogy, GE was selling new engines; ProEnergy was selling the whole car with a refurbished engine.

Because ProEnergy was selling these LM6000 packages, they also ended up winning the lucrative contracts to service those units.  This threatened GE's virtual monopoly on the market for servicing LM6000s.

### D.    Alta Needs Refurbished Turbines for its Peaker Plants

Enter Alta Power.  Alta was formed in 2017 to build three peaker plants in North Texas.  ROA.22702-06.  For these to be profitable, Alta determined that it needed refurbished LM6000s.  ROA.22523; ROA.22700-01.  ProEnergy fit the bill perfectly.  In August 2018, ProEnergy approached Alta with a binding offer to provide the full suite of peaker-plant services, including ProEnergy's bankable warranty, at a price Alta considered suitable.  ROA.22073; ROA.22728-79.

### E.    GE's TRUEPackage and "Partnership" with WattStock

As ProEnergy swallowed up GE's market share, GE had to respond.  So GE launched its own certified, refurbished, (supposedly) GE-warranted product to compete with ProEnergy: the GE "Aero TRUEPackage."  ROA.21297.

GE was not motivated to profit from selling refurbished turbines; it was motivated instead to stop losing money to ProEnergy and ultimately to drive up costs in the refurbished-turbine market.  ROA.22546-48.  Perhaps due to this playing-not-to-lose motivation, GE hedged its risk.  Buying and hoarding a stockpile of dormant LM6000s would have been too costly when GE had no real interest in engaging in the refurbished-turbine market.  *See* ROA.22546-48.

8

Enter WattStock.  WattStock was started by former GE employees who were willing to take on the risk of locating, procuring, refurbishing, and selling turbines for GE's TRUEPackage program.  ROA.20702; ROA.22546-66; ROA.22745; ROA.22291.  "[T]hrough a unique partnership" with WattStock, GE would offer a refurbished-turbine product to compete with ProEnergy's.  ROA.20701-03; ROA.20720; ROA.22792-93.  Banks would not hesitate to back projects with GE's warranty (although they would never have backed WattStock alone).  ROA.22437-39; ROA.22460-64.  So GE told potential customers that under its arrangement with WattStock, it was bound to provide its warranty for the TRUEPackage service.  ROA.22737-38; ROA.21894.

## F.    WattStock Approaches Alta Claiming to be GE's New Partner for Refurbished Turbines

With ProEnergy's offer to Alta on the table, WattStock began courting Alta. WattStock told Alta that it was GE's "exclusive partner" in implementing the TRUEPackage service.  ROA.22734-35.  WattStock hosted Alta's executives at GE's facilities, where WattStock's offices were located, and Alta met with both WattStock and GE employees.  ROA.22742-43; ROA.21306-08; ROA.22438-40. GE employees repeatedly emphasized GE's "partnership" with WattStock and assured Alta that GE and WattStock would stand behind and "fully wrap" (*i.e.*, refurbish and warranty) WattStock's work on the TRUEPackage products, effectively guaranteeing their quality and performance.  ROA.21713-15.  GE and

WattStock ultimately guaranteed that they would supply up to nine turbines for no more than $10 million per turbine if Alta selected WattStock over ProEnergy. ROA.22672-73; ROA.22293-94.  On the eve of the ProEnergy offer's expiration, GE took two of Alta's executives to lunch to close the deal.  ROA.21394; ROA.22493-94.  During that lunch meeting, GE again emphasized that GE and WattStock were contractually bound to one another in a "partnership" under which GE was obligated to stand behind everything WattStock does related to the TRUEPackage, and GE pledged that it would meet Alta's budgetary requirements. ROA.22750-53.  That all turned out to be a lie.

Two days later, Alta chose to proceed with GE and WattStock.  Given the promise of a GE warranty with its name-brand quality and GE's status as the original manufacturer, Alta believed GE's TRUEPackage was the best option.  ROA.22721.

## G.    Alta and WattStock Sign the Master Agreement

Alta and WattStock entered into the Master Agreement in February 2019.  The Master Agreement sets forth the terms governing Alta and WattStock's initial agreement to identify specific turbines for Alta to purchase.  ROA.21263.  Under the Master Agreement, WattStock would secure refurbished units on Alta's behalf using Alta's money, and then GE and WattStock would turn those used LM6000s into warranted, fully refurbished GE TRUEPackages for a price that would be determined in different, later contracts.  ROA.21263-66.

10

Once it signed the Master Agreement, Alta was locked in to obtain turbines exclusively from WattStock and GE. ROA.21267. WattStock used GE's proprietary database of existing LM6000s to identify every available refurbished LM6000 that satisfied Alta's requirements. ROA.21265. WattStock then put all these turbines on its "exclusivity list," such that any LM6000 that met Alta's requirements was covered by the Master Agreement, preventing Alta from procuring those turbines from anyone else. ROA.21267.

The Master Agreement contains a limitation-of-liability provision. ROA.21270. Section 9.1(B) limits consequential damages as follows:

> Art. 9.1(B): Notwithstanding any other provision of this Agreement, and to the fullest extent permitted by law, neither Party, their respective officers, directors, partners, employees, representatives, contractors or subcontractors shall be liable to the other or shall make any claim for any incidental, indirect or consequential damages arising out of or connected in any way to this Agreement. This mutual waiver of consequential damages shall include, but is not limited to, loss of use, loss of profit, loss of business, loss of income, loss of reputation or any other consequential damages that either Party may have incurred from any cause of action including negligence, strict liability, breach of contract and breach of strict or implied warrantee.

11

ROA.21270.[2]   Section 9.1(A) caps damages at $100,000 on "the other Party's liability":

> To the maximum extent permitted by law, each Party agrees to limit the other Party's liability for any and all claims, losses, costs, damages of any nature whatsoever or claims expenses from any cause or causes, including attorneys' fees and costs and expert-witness fees and costs, so that the total aggregate liability of a Party to the other shall not exceed the amount of USD $100,000. It is intended that this limitation shall apply to any and all liability or cause of action arising under this Agreement however alleged or arising, unless otherwise prohibited by law.

ROA.21270.  In sum, under the Master Agreement, WattStock's role was to locate turbines for Alta's peaker plants, and their purchase and "wrapping" by GE would be covered by later agreements.

## H.   GE and WattStock's Ruse Falls Apart

Alta never got its turbines.  After fraudulently coaxing Alta into signing with WattStock by claiming WattStock was its partner, GE's tortious campaign to destroy the refurbished-turbine market entered its next phase.

For its part, Alta fulfilled all the necessary prerequisites to building a peaker plant.  ROA.22713-15.  Alta secured options to buy land for the plants, lined up contractors to build the plants, negotiated natural-gas contracts, and completed all

---

[2] Section 9.1 of the Agreement is originally in bold, all-caps typeface.  For readability, that emphasis is removed throughout this brief.

the permitting and environmental work to get the peaker plant online. ROA.22713-15; ROA.22933. Alta paid WattStock over $3 million to inspect and secure the promised turbines. ROA.22324.

GE and Wattstock did not hold up their end of the bargain. Months after Alta and WattStock entered the Master Agreement, GE and WattStock eventually agreed that GE would be WattStock's subcontractor to refurbish the used turbines for the TRUEPackage program. ROA.20526. At the same time, after promising Alta turbines within its fixed budget, GE worked behind the scenes to warn potential sellers that those costly termination fees would still be due for selling its turbines to WattStock and Alta. ROA.22593; ROA.22297; ROA.22752. This drove up the cost of the turbines beyond Alta's fixed budget, as sellers priced those termination fees into the turbines WattStock was locating for sale to Alta. *See* ROA.21406. GE also stymied Alta by refusing to refurbish any LM6000 containing any competitor's parts, limiting the number of turbines that Alta could potentially acquire. ROA.22594-95; *see* ROA.8749. Thus, Alta was exclusively dependent on GE and WattStock for turbines, but there was no chance Alta would get the nine TRUEPackage turbines for $10 million apiece, as GE and WattStock promised.

By early 2020, WattStock had run out of money. *See* ROA.21315-35. WattStock acknowledged that its failure to locate suitable turbines meant it should, but could not, refund Alta's deposit. ROA.2138; ROA.22936. Alta then approached

13

GE and asked it to honor its commitment to ensure delivery of the nine TRUEPackage turbines at the price they discussed. ROA.2247-48; *see* ROA.22936. GE refused. GE revealed that, contrary to its repeated affirmations, it did not actually have a "binding" commitment to "fully wrap" and warrant the TRUEPackage turbines. ROA.22495. In fact, the agreement between GE and WattStock (which Alta was never shown until it was produced in this lawsuit) expressly disclaimed any partnership between the two relating to the TRUEPackage offering. ROA.21260-61; *see* ROA.22501-02.

## II.    Procedural History

### A.    Lawsuit Between Alta, WattStock, and GE

In June 2020, WattStock sued Alta in state court, and Alta counterclaimed against GE and WattStock. ROA.36. Alta's claims against GE were based on GE's false and misleading representations regarding the nature of its relationship with WattStock, its intent to backstop WattStock's work on refurbishing and delivering the TRUEPackages, and the pricing and availability of the TRUEPackage units. ROA.52-78.

GE moved to dismiss, arguing that liability for statements GE made in negotiations with Alta was foreclosed by Alta's Master Agreement with WattStock. ROA.20495. According to GE, "Alta promised it would not press claims for consequential damages against WattStock's contractors and subcontractors" in the

14

Master Agreement. ROA.20495. Although GE did not have any subcontractor relationship with WattStock related to TRUEPackage until July 2019 at the earliest, ROA.20526—five months after the Master Agreement—GE nevertheless argued that the Master Agreement barred Alta's claims for GE's fraudulent conduct before the Agreement. After a lengthy hearing, the state court denied GE's motion. ROA.20495.

WattStock went bankrupt in August 2021. ROA.9228. Alta's case against GE and WattStock was therefore removed to federal court and referred to the bankruptcy court. Bankruptcy Dkt. 1.[3] GE moved to dismiss Alta's claims under Rule 12(c), arguing again that "Section 9.1([B]) bars Alta's claims for consequential damages" because "GE contracted with WattStock to sell parts, engineering, and related services for" refurbished "turbines." Bankruptcy Dkt. 31 at 24. After another lengthy hearing, the bankruptcy court denied GE's motion. Bankruptcy Dkt. 47. Alta and WattStock later settled their claims, and WattStock was dissolved in the Chapter 11 proceedings.

The Alta–GE case returned to federal district court, where Alta filed an amended complaint against GE. ROA.2041-72. Alta asserted seven state-law causes of action: (1) vicarious liability; (2) unjust enrichment; (3) fraud;

---

[3] "Bankruptcy Dkt." refers to the bankruptcy court's docket, No. 21-03083-SGJ (N.D. Tex.).

(4) fraudulent inducement; (5) negligent misrepresentation; (6) civil conspiracy; and (7) tortious interference with prospective business relations. ROA.2061-67. As relevant here, GE answered by once again maintaining that Alta's Master Agreement with WattStock barred any claims for consequential damages based on the misrepresentations GE made in negotiating the deal. ROA.2088. Alta and GE cross-moved for summary judgment. ROA.7553-611; ROA.20480-514.

### B.    Summary-Judgment Proceedings

Two weeks after summary-judgment briefing was completed, the district court granted GE's motion in relevant part and denied Alta's. ROA.23856. The court explained that though this was an "intensely complex case," it had an "exceedingly straightforward answer." ROA.23857. According to the court, because the Master Agreement waives consequential damages against WattStock's subcontractors, and because GE at some point became a subcontractor of WattStock, Alta could not recover for GE's fraudulent conduct even before it became WattStock's subcontractor (*i.e.*, inducing Alta to sign the Master Agreement). ROA.23859-64. The court also rejected Alta's argument that the Master Agreement's consequential-damages waiver does not extend to intentional torts. ROA.23863-64.

The court next held that the Master Agreement's consequential-damages waiver is enforceable even though Alta alleged that GE fraudulently induced Alta to

16

sign the Master Agreement. ROA.23865-66. Reasoning by analogy to *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 232 (Tex. 2019) (holding that fraud did not, under the circumstances, vitiate a punitive-damages waiver), the court held that fraudulently induced consequential-damages waivers are enforceable under Texas law. ROA.23865-66. Thus, according to the court, "waving the fraud flag" is insufficient to render such a provision unenforceable. ROA.23866.

In its effort to "resolve[] the entire case on GE's motion for summary judgment," ROA.23867, the court also dismissed, without explanation, Alta's claims for *direct* economic damages—even though (1) the waiver provision that GE invoked applied only to consequential damages, (2) GE's summary-judgment motion only pertained to consequential damages, and (3) at minimum, GE said all damages should be capped at $100,000, which the court also did not address. Finally, the court dismissed Alta's claim for punitive damages because "to recover punitive damages, the party must first recover their actual damages." ROA.23866. Alta appealed.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's grant of summary judgment for three independent reasons.

*First*, the district court erred in concluding that the consequential-damages waiver in the Alta–WattStock Master Agreement limited GE's liability for its fraudulent conduct before the Agreement was signed. GE argues that it is a third-party beneficiary of the Alta–WattStock Agreement as a "subcontractor," but GE had not yet become WattStock's subcontractor when it fraudulently induced Alta to enter the Agreement. GE cannot be retroactively absolved of its pre-Agreement fraud because it became a subcontractor months after it defrauded Alta.

*Second*, even if GE were a third-party beneficiary of the Agreement in this way, Texas law provides that fraud vitiates a contract except in the rarest of circumstances. That is especially true where, as here, a third party attempts to shield itself from liability based on a contract between two other parties. The district court misread *Bombardier*'s enforcement of a *punitive*-damages waiver by a contractual *party* to have established a bright-line rule that fraud never vitiates a damages waiver. In reality, *Bombardier* was far narrower, enforcing a clear and unequivocal waiver only after balancing competing interests and carefully examining all the circumstances. *Bombardier* did not reverse a century of Texas jurisprudence barring the enforcement of fraudulently induced contracts. The district court's misunderstanding of Texas law was contrary to that well-established rule and *Bombardier* itself.

18

*Third*, the Alta–WattStock Agreement did not waive consequential damages for intentional torts. Although the consequential-damages waiver specifically listed only non-intentional torts, the district court deemed it determinative that it waived consequential damages for "any" cause of action, "including" the specified non-intentional torts. The district court, however, overlooked that Texas law disfavors liability waivers for intentional torts. Properly interpreted, the Agreement's failure to list or otherwise specify intentional torts shows that the parties did not intend to excuse wrongdoing like GE's fraud.

## STANDARD OF REVIEW

The Court "review[s] grants of summary judgment *de novo*, applying the same standard as the district court." *Catalyst Strategic Advisors, L.L.C. v. Three Diamond Cap, SBC, L.L.C.*, 93 F.4th 870, 874 (5th Cir. 2024) (citation omitted). Specifically, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "All reasonable inferences must be viewed in the light most favorable to the party opposing summary judgment, and any doubt must be resolved in favor of the non-moving party." *In re La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017).

19

**ARGUMENT**

In its effort to provide a straightforward answer to a complex case, the district court ironed out critical nuance in the dispute between Alta and GE. The district court granted summary judgment based upon one issue that GE addressed in only a page of its summary-judgment motion (citing no cases) and another that GE relegated to a footnote on that page (citing one case). That ruling came after two courts had previously rejected this same argument. In doing so, the district court misinterpreted the Master Agreement and misunderstood important principles of Texas law. The Court should reverse.

**I.**    **The district court misread the Alta–WattStock Master Agreement to immunize GE for fraudulent conduct it committed before it became Alta's subcontractor.**

The district court first erred in its interpretation of the Master Agreement between Alta and WattStock. The Agreement includes, among other things, a consequential-damages waiver for the performance of the Agreement between the parties to the contract: Alta and WattStock. It then extends that waiver to Alta's and WattStock's "officers, directors, partners, employees, representatives, contractors or subcontractors." ROA.21270. All agree that GE became WattStock's subcontractor at least several months after the Agreement was executed.

Alta alleges, however, that GE defrauded Alta by lying about its relationship with WattStock, among other things, *before* GE became WattStock's subcontractor.

20

That GE *later* became WattStock's subcontractor cannot retroactively immunize GE for actions it took when it was *not* a subcontractor.

## A. Texas law sets high bars for establishing limitations of liability and third-party-beneficiary status.

The district court mistakenly allowed GE to benefit from the consequential-damages waiver in the Master Agreement. Understanding why that was wrong requires some background on Texas law.

**1.** Texas courts interpret contracts according to their words' plain, ordinary meaning. *City of Fort Worth v. Rylie*, 602 S.W.3d 459, 467 n.19 (Tex. 2020). The goal is simple: interpret the ordinary meaning of the words to determine the parties' intent. *Rieder v. Woods*, 603 S.W.3d 86, 94 (Tex. 2020). Courts strive to interpret the entire contract in context so that all of its words have meaning in harmony with each other. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012). Indeed, "[c]ontext is a primary determinant of meaning." *Wal-Mart Stores, Inc. v. Xerox State & Local Sols., Inc.*, 663 S.W.3d 569, 578 (Tex. 2023) (quoting Scalia & Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012) ("READING LAW")). "If contract language can be given a certain or definite legal meaning when considered as a whole, and in light of the objective circumstances surrounding its execution, the contract is not ambiguous and must be construed as a matter of law." *Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 340 (Tex. 2023).

21

Consequential-damages waiver are common in business deals. *See* 24 WILLISTON ON CONTRACTS § 64:21 (4th ed. May 2025). Most contracts explain what happens in the event of a breach, as doing so helps make the fallout more predictable. *See FPL Energy, LLC v. TXU Portfolio Mgmt. Co., LP*, 426 S.W.3d 59, 65 (Tex. 2014) ("Freedom of contract allows parties to bargain for mutually agreeable terms and allocate risks as they see fit." (citation omitted)); *cf. Limitation-of-Damages Clause*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A contractual provision by which the parties agree on a maximum amount of damages recoverable for a future breach of the agreement.").

"A contractual breach may give rise to either 'direct' or 'consequential' damages." *Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 373 (Tex. 2019). Direct damages are more predictable because they are damages that a defendant is "conclusively presumed to have foreseen as a result of its breach." *Id.* (quotation marks omitted) Consequential damages, by contrast, "result naturally, but not necessarily, from the defendant's breach, and are not the usual result of the wrong." *Id.* (quotation marks omitted). Parties may contractually limit those less predictable damages so long as doing so is consistent with state law or public policy (*e.g.*, the contract is not procured by fraud, *see infra* at 34-40). *See Allright, Inc. v. Elledge*, 515 S.W.2d 266, 267-68 (Tex. 1974) (Reavley, J.); *accord*

TEX. BUS. & COM. CODE § 2.719(c) ("Consequential damages [in sales contracts] may be limited or excluded unless the limitation or exclusion is unconscionable.").

Damages limitations are conceptually distinct in important ways from disclaimer-of-reliance clauses or liability releases. A true disclaimer-of-reliance clause shows that the parties struck the deal based purely on the text of the agreement, and that the parties did not rely on any prior representations of the other party. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331-32 (Tex. 2011). This kind of clause must be "clear, specific, and unequivocal" about its intentions because, in rare circumstances, it can defeat even a fraudulent-inducement claim. *Transcor Astra Group S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 473 (Tex. 2022); *see Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 58-59 (Tex. 2008). That outcome is rare because, as a general rule, "a written contract [even] containing a merger clause can [nevertheless] be avoided for antecedent fraud," *Dall. Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 239 (Tex. 1957), drawing from the historical maxim: "*Fraus omnia corrumpit*: fraud vitiates everything it touches," *Italian Cowboy*, 341 S.W.3d at 336 (citation omitted); *see also Morris v. House*, 32 Tex. 492, 495 (1870) ("[I]t is properly said that fraud vitiates whatever it touches.").

A disclaimer-of-reliance clause is often coupled with a liability release in a settlement agreement that seeks to definitively end a protracted dispute. Disclaiming

23

reliance and releasing any claims prevents a follow-on case about how the settlement itself was fraudulently induced. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179-80 (Tex. 1997) ("Because the parties were attempting to put an end to their deal, and had become embroiled in a dispute over the feasibility and value of the project, we conclude that the disclaimer of reliance the Swansons gave conclusively negates the element of reliance."). No mere merger clause, even one that purports to disclaim reliance generally, will defeat a fraudulent-inducement claim—the bar is much higher, requiring a clear, specific, and unequivocal waiver. *Italian Cowboy*, 341 S.W.3d at 335-37 & n.8; *see id.* at 334 (merger clauses typically state "that there are no representations, promises or agreements between the parties except those found in the writing" (quoting RESTATEMENT (SECOND) OF CONTRACTS § 216 cmt. e (1981))).

Releases are construed narrowly, too. They must "'mention' the claim to be released," and "any claims not clearly within the subject matter of the release are not discharged." *Victoria Bank & Tr. Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991). And "to avoid unintentionally losing valuable rights against unnamed—and perhaps unknown—wrongdoers," "a release will discharge only those persons 'named' or identified 'with such descriptive particularity' that their identity or connection to the released claims 'is not in doubt.'" *Finley*, 672 S.W.3d at 339. This "requirement of specific identification is not met unless the reference in the release is so particular

24

that 'a stranger could readily identify the released party.'" *Id.* (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex. 1984)).

Context is especially important for limitations and releases of liability. When an agreement aims to finally end a long-running dispute—and to prevent reprisals and even more lawsuits—disclaimers of reliance and releases are best construed in that light. *See Schlumberger*, 959 S.W.2d at 179-80. But where an agreement "is the initiation of a business relationship," it "should be all the more clear and unequivocal" that the parties "disclaim[] reliance and preclud[e] a claim for fraudulent inducement, lest we 'forgive intentional lies regardless of context.'" *Italian Cowboy*, 341 S.W.3d at 335 (quoting *Forest Oil*, 268 S.W.3d at 61).

"Having set the textual table," *Vitol, Inc. v. United States*, 30 F.4th 248, 253 (5th Cir. 2022), return to the Master Agreement. Recall that Alta and WattStock entered into the Master Agreement in February 2019. ROA.21263. WattStock's job was to locate and secure turbines for Alta's peaker plants. ROA.21265-66. If either party breached the Agreement, Alta and WattStock agreed in Section 9.1(B) that neither could be liable for consequential damages "arising out of or connected in any way to this Agreement," and it extended that waiver to each party's "respective officers, directors, partners, employees, representatives, contractors or subcontractors." ROA.21270. The parties did not include a release of liability, or

25

any merger or disclaimer-of-reliance clause, which is hardly surprising given the business-initiating nature of the Agreement.

2.    That lays the groundwork for the *parties* to the Agreement. But GE was not a party. At GE's insistence, the deal was between Alta and WattStock alone, *see* ROA.20554; indeed, the Agreement does not mention GE at all. For GE to nonetheless enjoy the benefits of the Master Agreement (and its consequential-damages waiver) between Alta and WattStock, GE must have been an intended third-party beneficiary of the Agreement. "[A] non-party to a contract has a heavy burden when it claims third-party beneficiary status." *Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531, 540 (5th Cir. 1994). That is because, "[a]s a general rule, the benefits and burdens of a contract belong solely to the contracting parties." *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017). Courts therefore should be wary "about expanding the rights of interlopers" as third-party beneficiaries unless it is clearly the intent of the parties to the contract. *S. Methodist Univ. v. S. Cent. Jurisdictional Conf. of the United Methodist Church*, 716 S.W.3d 475, 489-91 (Tex. 2025).

"[A] person seeking to establish third-party-beneficiary status must demonstrate that the contracting parties intended to secure a benefit to that third party and entered into the contract directly for the third party's benefit." *Id.* at 489 (quoting *First Bank*, 519 S.W.3d at 102). "[I]n Texas the law is clear that one

26

claiming to be a third-party beneficiary succeeds or fails according to the provisions of the contract sued upon." *Cunningham v. Healthco, Inc.*, 824 F.2d 1448, 1457 (5th Cir. 1987). And "[i]f there is any doubt concerning the intent" to secure a benefit for a third party, "such doubt should be construed against such intent." *Talman Home Fed. Sav. & Loan Ass'n of Ill. v. Am. Bankers Ins.*, 924 F.2d 1347, 1351 (5th Cir. 1991) (citing Texas cases).

### B. GE was not acting as WattStock's subcontractor when it defrauded Alta through its pre-Agreement actions to induce Alta to sign the Agreement.

According to the district court, Alta and WattStock clearly intended to secure to GE a waiver of consequential damages for fraudulent conduct it committed *before* the Agreement. The district court reasoned that Alta and WattStock did so by including the "subcontractor" language in the waiver because long after the Agreement was struck, "GE contracted with WattStock to sell parts, engineering, and related services for" the refurbished "turbines" that WattStock was securing for Alta.[4] That is wrong for several reasons.

Start with the text of the consequential-damages waiver. It provides that "neither party," nor their respective "subcontractors shall be liable to the other" for any "consequential damages arising out of or connected in any way to this

---

[4] *See* Bankruptcy Dkt. 31 at 24.

Agreement." ROA.21270. GE is not a party, so it must fall within the "subcontractors" class to obtain the benefits of the Agreement. The question comes down to the scope of that class. Does it include all conduct by anyone who has ever been a subcontractor, or does it cover only conduct taken by subcontractors *as subcontractors*? Since the Agreement extends the consequential-damages waiver to classes of third parties because of their *relationship* to the contracting parties, it follows that the waiver extends only insofar as those third parties are acting in their identified capacity.

The relevant term is "subcontractor." "By definition, a subcontractor enters into an agreement with a contractor, rather than the principal party whose performance is payment in exchange for the provision of goods or services or the completion of a project." *Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 778 (5th Cir. 2006) (citing BLACK'S LAW DICTIONARY (8th ed. 2004)). Indeed, more recent definitions of the term presuppose that a subcontractor is one "who is awarded a portion of an *existing contract* by a contractor, esp. a general contractor," meaning that a subcontractor cannot exist until the initial contract is created. *See Bayou Steel Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 642 F.3d 506, 511 (5th Cir. 2011) (quoting BLACK'S LAW DICTIONARY (9th ed.

28

2009) (emphasis from *Bayou Steel*)).[5]  Thus, definitionally, GE could not have been acting as a subcontractor before the Master Agreement existed.

Nevertheless, the district court concluded that (A) because GE became WattStock's subcontractor *after* the Agreement, and (B) GE's unlawful activity *before* the Agreement was "connected in some way" to the Agreement, (C) GE could not be held liable for its fraudulent conduct preceding the Agreement.  ROA.23862-64.  But at (C) there is a disconnect: The waiver does not protect anyone who becomes a subcontractor; it protects a subcontractor qua subcontractor.

Thus, if GE subcontracted to refurbish a turbine for WattStock, but GE negligently destroyed the turbine and caused Alta consequential damages, Alta could not sue WattStock or GE to recover those damages.  If there is any clear intent to benefit GE in the Agreement, it is only in its capacity as subcontractor.  But here, GE did not defraud Alta in its subcontractor capacity.  The fraud occurred long before GE became a subcontractor in July 2019, *see* ROA.20526, when GE lied to Alta throughout 2018 and early 2019 about GE's relationship with WattStock

---

[5] The dictionary in use at the time of the Master Agreement said the same: "Someone who is awarded a portion of an existing contract by a contractor, esp. a general contractor. • For example, a contractor who builds houses typically retains subcontractors to perform specialty work such as installing plumbing, laying carpet, making cabinetry, and landscaping—each subcontractor is paid a somewhat lesser sum than the contractor receives for the work." *Subcontractor*, BLACK'S LAW DICTIONARY (11th ed. 2019).

preceding the February 2019 Master Agreement. *E.g.*, ROA.22828-29. So GE cannot benefit from the Agreement's damages waiver.

*Finley* is instructive. There, a complicated dispute arose over mineral interests in a tract in Loving County, Texas. 672 S.W.3d at 335. A few key facts are relevant: Headington Royalty and Finley Resources worked together on a lease producing oil; Finley owed Headington notice obligations to prevent the lease from expiring; Finley (allegedly) failed those notice obligations, leading to the expiration of the lease. *Id.* Petro Canyon Energy was set to take over the lease, but because of the disputed nature of the lease's expiration, Petro Canyon acquired Finley's interests in the prior lease. *Id.* Petro Canyon then sold all of its interests in the tract to Headington. *Id.* at 336. That conveyance included a release provision, in which Headington released from liability "Petro Canyon and its affiliates and their respective officers, directors, shareholders, employees, agents, predecessors and representatives for any liabilities" "related in any way to the Loving County tract." *Id.* (emphases omitted) Later, Headington sued Finley for the latter's original failure to comply with the notice obligations in the old lease. *Id.* at 337.

Finley claimed that the release in the conveyance covered Finley because Finley was Petro Canyon's "predecessor," and Headington's suit was "related in [some] way to the Loving County tract." *Id.* The Texas Supreme Court disagreed. Despite Finley's claim that "predecessor" was broad, and that the release's language

30

was "otherwise broad and encompassing," the court explained that the term "predecessor" must be "informed by its grammatical use." *Id.* at 340, 343. Because the term "predecessor[]" connoted "a prior connection *to the corporate entities themselves*, not the land," the court concluded that the term referred to *corporate* predecessors, not predecessors-in-interest like Finley. *Id.* at 343.

Similar to *Finley*, this Court must construe the classes of named individuals in context. And here, "contractors and subcontractors" bear a connection to the *work performed* under the Agreement. *See id.* (noting the class's connection to the party limits the scope of the release). That context necessarily means that the Agreement does not extend to subcontractors' actions outside the scope of their status as subcontractors to the Agreement—and certainly not to fraudulent actions before the Agreement was even executed.

To hold otherwise would be untenable. Assume, in *Finley*, that after the Court concluded Finley was not a "predecessor[]" of Petro Canyon, Finley bought shares in Petro Canyon. As one of Petro Canyon's "shareholders," Finley would fall squarely within the release between Headington and Petro Canyon. Yet Finley would be laughed out of court for claiming that Headington's suit was now barred by the release. That is precisely what GE does here by arguing that it is retroactively immunized because it became a subcontractor after its fraudulent conduct. That is not a reasonable interpretation of the Agreement.

31

The district court reasoned that waivers for classes such as employees, contractors, and subcontractors are not limited to those who had that status at the time the Agreement is signed. ROA.23862-63. That is true in one sense: If John Doe was not an employee of Alta when the Agreement was signed, but later became an employee and caused damage to WattStock in that capacity, he would be protected by the consequential-damages waiver for acts of employees. But it does not follow that John Doe would be immunized for tortious acts he committed *before* he became an Alta employee. That logical leap violates any sensible reading of the Agreement and serves no rational purpose.

The district court concluded that the only limit on subcontractor immunity stems from the requirement that the claim "aris[e] out of or [be] connected in any way" to the Agreement. ROA.23862. But this language does not supplant the baseline requirement that conduct is only immunized if it is undertaken in a subcontractor capacity. Properly understood, the "arising out of or connected in any way" language is a subject-matter *limitation* on the damages waiver, not a temporal expansion of the waiver to reach conduct predating the Agreement and GE's subcontractor status. In other words, GE can only claim shelter in the waiver provision for acts it performs when it is a subcontractor *and only if* those acts also arise out of or are connected to the Agreement. GE cannot rely on the fact that it later became a subcontractor to immunize actions it performed before the Agreement

32

was even signed.  Holding otherwise would misread the Agreement's plain text and turn the liability limitation into either a release or a disclaimer-of-reliance provision. Under Texas law, those are much harder to establish, and for good reason: it prevents the "forgive[ness of] intentional lies regardless of context." *Forest Oil*, 268 S.W.3d at 61.  GE should not be artfully absolved for its fraudulent conduct in this way.

*

At bottom, the district court missed a critical wrinkle in the Agreement: Alta and WattStock did not clearly intend to waive consequential damages for the actions of anyone who became a subcontractor, but instead only those actions of a subcontractor *as a* subcontractor.  The state court and bankruptcy court both rejected GE's arguments for that reason.  Under Texas law, that is the only reasonable interpretation of the Agreement.  And "if there is any doubt" about whether the parties intended to immunize GE for its pre-subcontractor conduct, that "doubt must be construed against [GE]." *Talman Home Fed. Sav. & Loan Ass'n of Ill.*, 924 F.2d at 1351.  Accordingly, this Court should reverse the district court's judgment and hold that the consequential-damages waiver does not cover GE's conduct outside its status as a subcontractor.[6]

---

[6] Because the district court's rejection of Alta's claim for punitive damages hinged on Alta's inability to recover actual damages, the Court should reverse the district court's judgment in full, allowing Alta to pursue its claims for punitive damages in addition to its actual damages.

**II.    The district court misapplied Texas law by enforcing a fraudulently induced consequential-damages waiver in favor of a non-party.**

There is a second, independent reason for reversal even if GE's acts were covered by the consequential-damages waiver. The district court legally erred in concluding that GE could procure such a waiver by fraudulent means and then enforce it against Alta. In cursory fashion, the district court stamped out almost two centuries of Texas jurisprudence. This holding, based on a footnoted argument in GE's summary-judgment motion, should be reversed.

**A.    Fraud vitiates contracts under Texas law except in rare circumstances.**

1.    "For as long as the State of Texas has been the State of Texas," *Rylie*, 602 S.W.3d at 460, Texas courts have recognized that "fraud vitiates whatever it touches," *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015) (citation omitted); *see Wintz v. Morrison*, 17 Tex. 372, 383 (1856) ("Nothing can be better settled than that fraud vitiates every contract, and may consist either in misrepresentation or in concealment."). The Supreme Court of the United States has long embraced this principle as well. *United States v. Throckmorton*, 98 U.S. 61, 64 (1878) ("There is no question of the general doctrine that fraud vitiates the most solemn contracts, documents, and even judgments."). So have the leading authorities on the subject. *Reaves*, 307 S.W.2d at 239 (bringing errant precedents "on the subject in this state into harmony with the great weight of authority," citing,

34

among others, RESTATEMENT (FIRST) OF CONTRACTS § 573 (1932), 3 CORBIN ON CONTRACTS § 580 (1952), 5 WIGMORE ON EVIDENCE § 2439 (2d ed. 1923)). Thus, in Texas, "the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it." *Reaves*, 307 S.W.2d at 239 (citation omitted).

As with any general rule, countervailing interests have sometimes created exceptions, but only sparingly. Consider the examples discussed earlier: fraudulently induced settlement agreements containing releases and disclaimers of reliance. *E.g.*, *Italian Cowboy*, 341 S.W.3d at 331-36; *Forest Oil*, 268 S.W.3d at 54; *Schlumberger*, 959 S.W.2d at 180. There, the combination of the strong policy interest in freedom of contract and "the strong policy favoring settlement agreements" warranted an exception. *Italian Cowboy*, 341 S.W.3d at 333. But even then, a disclaimer of reliance by itself will not "automatically preclude[] a fraudulent-inducement claim." *Forest Oil*, 268 S.W.3d at 61. Rather, a court must weigh certain factors, such as whether the terms were negotiated or boilerplate, whether the deal involved sophisticated parties and counsel, and whether the release language was clear and unequivocal. *Transcor*, 650 S.W.3d at 473-74.

2.    Against this backdrop came *Bombardier*. Plaintiffs bought a private jet from Bombardier Aerospace Corporation for around $20 million. 572 S.W.3d at 217. Under the purchase agreement, plaintiffs expected to get a *new* jet, so they

35

agreed to give Bombardier their power of attorney to inspect and accept the jet. *Id.* As it turned out, the jet was not new, so plaintiffs later sued for breach of contract and fraud. *Id.* at 218-19. A jury awarded plaintiffs the difference between the price of a new jet and the jet they received—*i.e.*, their actual damages—and, because they proved fraud, punitive damages. *Id.* at 219 (citing TEX. CIV. PRAC. & REM. CODE § 41.003). On appeal, Bombardier argued that the purchase agreement between plaintiffs and Bombardier waived the right to seek punitive damages. *Id.* at 229-30.

The Texas Supreme Court agreed. *Id.* at 232. The court first acknowledged that "fraud vitiates whatever it touches," *id.* (quoting *Hooks*, 457 S.W.3d at 57), but noted that in certain circumstances, a limitation-of-liability clause could limit some liability even where some fraud occurred, *id.* (citing *Italian Cowboy*, 341 S.W.3d at 332). The court then likened the punitive-damages waiver to a disclaimer-of-reliance clause, noting that "sophisticated parties" could disclaim reliance *between them* for "a specific matter in dispute." *Id.* Quoting *Italian Cowboy*, the court "balanc[ed] the competing interests between protecting parties from 'unintentionally waiving a claim for fraud' and 'the ability of parties to fully and finally resolve disputes between them,'" *id.* (quoting 572 S.W.3d at 332), and concluded that "parties can bargain to limit exemplary damages," *id.*

Additional considerations informed the court's decision. For one, despite the alleged fraud, the plaintiffs did not seek to render the entire purchase agreement

unenforceable; they wanted to keep the jet and collect actual damages from the breach of the agreement, but strike out *only* the punitive-damages waiver. *Id.* at 232-33. The court reiterated that "the purchasing parties did not waive a claim for fraud; they only waived the ability to recover punitive damages for any fraud." *Id.* at 232. And the court ensured that the plaintiffs could still recover actual damages. *Id.* at 233. On this ground, the court distinguished other cases invalidating fraudulently induced "as is" clauses because those cases were about recovering actual damages, and "nowhere do the provisions at issue [in *Bombardier*], read as a whole, limit actual damages." *Id.*

Based on the clarity of the waiver, the totality of the circumstances, and the exemplary nature of punitive damages, the court weighed the interests and concluded that the punitive-damages waiver was enforceable. *Id.* at 233-34.

### B. The district court misapplied Texas law on how fraud affects damages waivers.

The district court overread *Bombardier*'s limited holding, overlooked the interest-balancing in *Bombardier*'s careful analysis, and too quickly overrode the rule that fraud vitiates all it touches. The court broadly quoted *Bombardier* for the proposition that the Texas Supreme Court has "never held" "that fraud vitiates a limitation-of-liability clause," and that it "must respect and enforce terms of a contract that parties have freely and voluntarily entered." ROA.23865 (quoting *Bombardier*, 572 S.W.3d at 232). Then the court noted that the contract in

37

*Bombardier* also included a consequential-damages waiver, *id.*, even though consequential damages were not at issue in *Bombardier*, *see* 572 S.W.3d at 232-33 (emphasizing that it was enforcing only a waiver of punitive—not actual—damages). The court concluded that the "Texas Supreme Court has made clear that waving the fraud flag does not constitute a compelling reason" to invalidate a liability limitation. ROA.23866. Thus, without further analysis, the district court extended *Bombardier*'s holding to a waiver of *actual* damages invoked by a *non-party* to the contract.[7]

In fairness to the district court, it might have missed the nuance in *Bombardier* because the argument occupied only a footnote in GE's summary-judgment motion. If the district court had evaluated *Bombardier* and *Italian Cowboy* together against the background principles of Texas law, summary judgment would have been denied. Start with the differences between Alta and the *Bombardier* plaintiffs. Alta

---

[7] The court also found it relevant that post-*Bombardier* cases have said that "[a]bsent a compelling reason, courts must respect and enforce the terms of a contract that the parties have freely and voluntarily made." ROA.23865-66 (quoting *Great Hans, LLC v. Liberty Bankers Life Ins. Co.*, No. 05-17-01144-CV, 2019 WL 1219110, at *9 (Tex. App.—Dallas Mar. 15, 2019, no pet.) (mem. op.)). That is unsurprising; the opinion that *Bombardier* reversed said the same, and it has long been the standard. *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 565 S.W.3d 280, 303 (Tex. App.—Dallas 2017) (quoting *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016)), *rev'd in part*, 572 S.W.3d 213 (Tex. 2019). And while the court in *Great Hans* discussed *Bombardier*, it had already concluded that the trial court properly held there was no fraud. 2019 WL 1219110, at *9.

does not seek to enforce any part of the Master Agreement against GE, while the *Bombardier* plaintiffs sought to enforce the agreement without being bound by the limitation on punitive damages. *See* 572 S.W.3d at 232; *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 135 (Tex. 2005) (a plaintiff "cannot both have his contract and defeat it too" by "turn[ing his] back on the portions of the contract . . . [he] finds distasteful." (citation omitted)); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 755 (Tex. 2001) ("[A] litigant who sues based on a contract subjects him or herself to the contract's terms."). Furthermore, Bombardier and the plaintiffs were all party to the purchase agreement, 572 S.W.3d at 232; GE was not a contractual party, and is instead seeking to shoehorn itself into the damages waiver between Alta and WattStock. Finally, enforcing the damages waiver effectively precludes Alta's ability to recover its actual damages, while *Bombardier* specifically distinguished other cases by noting that "nowhere do the provisions at issue, read as a whole, limit actual damages." *Id.* at 233.

All these factors were critical in *Bombardier*, but they are absent here. Background principles, moreover, weigh against extending the waiver to GE. That GE is neither a party to nor mentioned in the Agreement renders the waiver not "clear, specific, and unequivocal" enough to cover GE. *Transcor*, 650 S.W.3d at 473; *see Finley*, 672 S.W.3d at 344-45 (failure to mention third party was evidence that parties did not intend to release third party from liability). Because Alta and

39

WattStock were at the "initiation of a business relationship," it needed to be "all the more clear and unequivocal" that they intended the Agreement to limit their liability for acts *preceding* the Agreement. *Italian Cowboy*, 341 S.W.3d at 335. And they needed to clearly intend the same for non-party "subcontractors[']" conduct outside their status as subcontractors *before* the Agreement existed. *See S. Methodist Univ.*, 716 S.W.3d at 489-91 (warning against expanding contractual rights to third-party interlopers unless clearly intended by the parties). The district court should have applied the bedrock rule that—absent narrowly drawn exceptions—fraud "vitiates whatever it touches." *Hooks*, 457 S.W.3d at 57 (citation omitted). Doing so would have compelled the conclusion that GE cannot enforce the Alta–WattStock Agreement's consequential-damages waiver to limit actual damages for its fraudulent conduct.

**

The district court's acceptance of GE's abbreviated argument allowed a fraudster to benefit from a consequential-damages waiver in a contract to which it was not a party. That holding sweeps far beyond the narrow, clear, and specific limitation that *Bombardier* addressed. The Court should correct this legal error and reverse summary judgment.

40

**III.    The district court misread the Master Agreement to limit damages for GE's intentional torts.**

The district court erred for a third dispositive reason.  It gave short shrift to the important difference between intentional torts—like GE's fraud, civil conspiracy, and tortious interference—and the unintentional torts enumerated in the consequential-damages waiver.  Even if GE were a third-party beneficiary of the Master Agreement, the consequential-damages waiver extends only to *unintentional* torts.

Texas courts apply the maxim *expressio unius est exclusio alterius*— "expressing one item of a commonly associated group or series excludes another left unmentioned."  *City of Austin v. Powell*, 704 S.W.3d 437, 453 (Tex. 2024) (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)); *see First Nat'l Bank of Luling v. Nugent*, 384 S.W.2d 224, 226 (Tex. App.—San Antonio 1964, writ ref'd n.r.e.) ("[T]he expression in a contract of one or more things of a class implies the exclusion of all not expressed, even though all would have been implied had none been expressed.").  This doctrine applies where it is "fair to suppose that [the drafters] considered the unnamed possibility and meant to say no to it."  *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 429 (Tex. 2017) (citation omitted).

Here, Section 9.1(B)'s consequential-damages waiver enumerates specific causes of action, all of which are contract-related or unintentional torts.  ROA.21270 (barring consequential damages for "any cause of action including negligence, strict

41

liability, breach of contract, and breach of strict or implied warrantee"). This list necessarily implies the exclusion of other claims, including intentional torts like fraud and tortious interference with prospective business relations, which are analytically distinct from the enumerated claims. And here, it is eminently "fair to suppose" that Alta and WattStock did not intend to waive consequential damages for the other's intentional and fraudulent conduct. "Generally, a contractual provision 'exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.'" *Zachry Const. Corp. v. Port of Hous. Auth. of Harris Cnty.*, 449 S.W.3d 98, 116 (Tex. 2014) (citation omitted). "To conclude otherwise would incentivize wrongful conduct and damage contractual relations." *Id.* That is the rule in Texas and "at least 28 American jurisdictions." *Id.* Thus, given that Texas law draws a stark line between waiving negligence and intentional torts, Alta and WattStock would have explicitly stated they were waiving the latter if they intended to do so.

Other textual clues indicate that Alta and WattStock did not intend for Section 9.1(B)'s consequential-damages waiver to cover intentional torts. Consider the difference between how that provision presents the categories of damages versus the causes of action. Section 9.1(B) contains two "lists" that clarify its intended scope: (1) a list of different categories of consequential damages arising from (2) a list of different causes of action. ROA.21270. Section 9.1(B) employs the phrase "shall

42

include but is not limited to" to tee up the (unlimited) categories of consequential damages that the provision waives.  ROA.21270.  Then, when Section 9.1(B) enumerates the causes of action to which the waiver applies, it uses the more *limited* phrase "including," followed by a list of causes of action involving only breaches of contracts and warranties, and unintentional torts.  The parties chose to use distinct phrases, and that choice should be given effect.  *See Great Lakes Ins., S.E. v. Gray Grp. Invs., L.L.C.*, 76 F.4th 341, 347 (5th Cir. 2023) ("The difference in verbiage is critical because under principles of contract interpretation, a word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning." (quotation marks and alterations omitted)).  With this more limited "including" language, "any cause of action" should be read in light of the list that follows it.  *Waak v. Rodriguez*, 603 S.W.3d 103, 108 (Tex. 2020) ("including" language limited broader "any person" language by the types of examples covered by statute because "[i]f the statute meant any person at all, then the four examples listed would be surplusage").

Section 9.1(A) also supports this interpretation of Section 9.1(B).  *See Hooks*, 457 S.W.3d at 63 ("We attempt to harmonize all contractual provisions by 'analyzing the provisions with reference to the whole agreement.'" (quoting *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005))).  Section 9.1(A) caps each party's liability at $100,000 for claims arising directly "under" the

Master Agreement: "It is intended that this limitation [of $100,000] shall apply to *any and all liability* or cause of action arising under this Agreement *however alleged or arising*." ROA.21270 (emphases added). The parties thus knew precisely how to limit "any and all" liability "however alleged or arising," but they did so in Section 9.1(A), not Section 9.1(B).

The district court concluded that Section 9.1(B)'s "including" language was intended to be illustrative, not exclusive, and thus Alta and WattStock must have meant for the waiver to extend to "any cause of action—whether it be breach of contract, fraud, negligence, or otherwise." ROA.23864. But Texas law recognizes a significant distinction between waivers of negligence versus intentional torts. *Zachry*, 449 S.W.3d at 116. The district court disregarded any intent distinction based on the refrain that parties are free to contract as they see fit and that the contract "means what it says and says what it means." ROA.23864. As *Zachry* noted, however, "that freedom has limits." 449 S.W.3d at 117. And here, extending the consequential-damages waiver to cover third-party GE's intentional torts "allow[ed] one party to intentionally injure another with impunity." *See id.*

The district court also rejected Alta's argument that the disparate use of "including" and "shall include but is not limited to" in Section 9.1(B) is a textual signal that the causes of action covered were more limited. *See* ROA.23864. It claimed that "this slight distinction in phrasing between" the two clauses "does not

give rise to a difference that bears legal effect," citing Scalia & Garner for the proposition that "shall include but is not limited to" is "merely a 'belt[]-and-suspenders' way of saying 'including.'" ROA.23865 (quoting READING LAW, *supra*, at 132-33). But this rule of thumb is unilluminating when the parties used *both* "including" and the longer phrase in the *same provision*. *Cf. Malouf v. State ex rels. Ellis*, 694 S.W.3d 712, 727 (Tex. 2024) ("[W]e generally presume the Legislature uses the same word consistently throughout the statute and uses different words to convey different meanings."); READING LAW, *supra*, at 170-73; *see also Malouf*, 694 S.W.3d at 728 (finding close proximity relevant to application of canon). After all, the nonexclusive meaning of "include" is only a "presumption" that "ordinarily" applies. READING LAW, *supra*, at 132. Here, both the parties' disparate usage and background principles of Texas law indicate that they intended to include only non-intentional wrongs within the consequential-damages waiver.

The district court erred in rejecting the parties' distinction between intentional and unintentional torts. Accordingly, for this independent reason, summary judgment should be reversed.

45

## CONCLUSION

The Court should reverse the district court's judgment in full, hold that the consequential-damages waiver does not cover Alta's claims against GE, and remand for further proceedings.

Dated:  October 15, 2025

Respectfully submitted,

*/s/ Aaron M. Streett*

John B. Lawrence
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
john.lawrence@bakerbotts.com

Michael Cancienne
Joseph W. Golinkin II
JORDAN, LYNCH & CANCIENNE PLLC
1980 Post Oak Boulevard
Houston, Texas 77056
(713) 220-4019
mcancienne@jlcfirm.com
jgolinkin@jlcfirm.com

Aaron M. Streett
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com
beau.carter@bakerbotts.com

*Counsel for Alta Power, LLC*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,111 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.  This brief was scanned for viruses and none were present.

*/s/ Aaron M. Streett*
Aaron M. Streett

## CERTIFICATE OF SERVICE

I certify that on October 15, 2025, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ Aaron M. Streett*
Aaron M. Streett