No. 25-10774

# In the United States Court of Appeals for the Fifth Circuit

ALTA POWER, L.L.C.,

*Plaintiff – Appellant*,

v.

GENERAL ELECTRIC INTERNATIONAL, INCORPORATED,

*Defendant – Appellee.*

On Appeal from the United States District Court for the
Northern District of Texas, Dallas Division,
Case No. 3:23-cv-270-X

**BRIEF OF APPELLEE**

Allyson N. Ho
John T. Cox
Bradley G. Hubbard
Andrew P. LeGrand
Bryston C. Gallegos
Arjun Ogale
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2934

COUNSEL FOR APPELLEE
GENERAL ELECTRIC INTERNATIONAL, INCORPORATED

## CERTIFICATE OF INTERESTED PERSONS

No. 25-10774,
*Alta Power, L.L.C. v. General Electric International, Incorporated*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiff–Appellant | Counsel for Plaintiff–Appellant |
| --- | --- |
| Alta Power, L.L.C. | Aaron M. Streett<br>David Robert Eastlake<br>Beau Carter<br>BAKER BOTTS, LLP<br>910 Louisiana Street<br>Houston, Texas 77002<br><br>John B. Lawrence<br>BAKER BOTTS, LLP<br>2001 Ross Avenue, Suite 900<br>Dallas, Texas 75201<br><br>Ariel Dawn House<br>BAKER BOTTS, LLP<br>100 California Street, Suite 3600<br>San Francisco, California 94111<br><br>Joseph W. Golinkin, II<br>Michael A. Cancienne<br>JORDAN, LYNCH & CANCIENNE PLLC<br>1980 Post Oak Boulevard, Suite 2300<br>Houston, Texas 77056 |

**CERTIFICATE OF INTERESTED PERSONS**
(continued)

| Defendant–Appellee | Counsel for Defendant–Appellee |
|---|---|
| General Electric International, Incorporated | Allyson N. Ho<br>John T. Cox<br>Bradley G. Hubbard<br>Andrew P. LeGrand<br>Erin Marie Choi<br>Bryston C. Gallegos<br>Arjun Ogale<br>GIBSON, DUNN & CRUTCHER LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201 |

Respectfully submitted,

/s/ *Allyson N. Ho*
Allyson N. Ho

*Counsel of Record for General Electric International, Incorporated*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary because the facts and legal arguments have been adequately presented in the briefs and record, and the decisional process wouldn't be aided significantly by oral argument. If, however, the Court believes that oral argument would be helpful, GE would welcome the opportunity to present argument.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ..................................................... i

Statement Regarding Oral Argument ...................................................... iii

Table of Authorities ................................................................. vi

Introduction ........................................................................ 1

Issues Presented .................................................................... 3

Statement of the Case ............................................................... 4

    I.     Alta pursues a novel venture of building "peaker" power plants in Texas. .................................................................. 4

    II.    GE and WattStock work together to offer refurbished and warrantied GE gas turbines. ....................................................... 4

    III.   Alta enters contracts with WattStock and GE that expressly waive Alta's ability to seek consequential damages. ..................................................... 6

    IV.   Alta's peaker-plant venture fails for reasons unrelated to GE or WattStock. .................................................... 11

           A.     Deutsche Bank declines to finance Alta's venture. ......... 11

           B.     Starwood also declines to back Alta's venture. ............... 13

    V.     Alta unilaterally terminates its contracts with WattStock, prompting this litigation. ...................................................... 13

    VI.    The district court grants GE summary judgment. ................... 15

Summary of the Argument ................................................................. 19

Standard of Review ...................................................................... 23

Argument ................................................................................ 24

    I.     Summary judgment was proper because the Master Agreement's plain language bars lost profits. .......................... 24

           A.     The Master Agreement's consequential-damages waiver bars Alta from seeking lost profits from GE. ....... 25

B.     The Master Agreement wasn't the only contract in which Alta waived consequential damages. ..................... 30

C.     Alta can't evade the Master Agreement's plain text. ..... 33

II.   GE is entitled to summary judgment on additional, independent grounds. ........................................................ 49

A.     Alta's lost-profit damages are too speculative to be recoverable as a matter of Texas law. ........................... 50

B.     Alta's recovery of lost profits is barred by the statute of frauds. ....................................................................... 53

Conclusion ................................................................................... 56

Certificate of Service .................................................................. 58

Certificate of Compliance ........................................................... 58

## Cases

*1925 Valley View, L.L.C. v. Prime Income Asset Mgmt., L.L.C.,*
595 F. App'x 306 (5th Cir. 2014) ....................................................... 45

*Allright, Inc. v. Elledge,*
515 S.W.2d 266 (Tex. 1974) ............................................................. 25

*Am. Midstream (Ala. Intrastate), LLC v. Rainbow Energy Mktg. Corp.,*
714 S.W.3d 572 (Tex. 2025) ............................................. 22, 51, 52, 53

*Barnhart v. Peabody Coal Co.,*
537 U.S. 149 (2003) ........................................................................ 45

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.,*
590 S.W.3d 471 (Tex. 2019) .......................................................... 27, 28

*Baylor Univ. v. Sonnichsen,*
221 S.W.3d 632 (Tex. 2007) ........................................................... 23, 56

*Bayou Steel Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh,*
642 F.3d 506 (5th Cir. 2011) ........................................................... 38

*BFS Grp. LLC v. De Leon,*
--- S.W.3d ----,
2025 WL 2394091 (Tex. App.—Houston [14th Dist.]
Aug. 19, 2025, pet. filed) ............................................................... 27, 34

*BigCommerce, Inc. v. Cover Genius Warranty Servs., LLC,*
2025 WL 1270110 (W.D. Tex. Feb. 27, 2025) .................................... 41

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC,*
572 S.W.3d 213 (Tex. 2019) ..................................................... *passim*

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ........................................................................ 24

*Celtic Marine Corp. v. James C. Justice Cos.,*
760 F.3d 477 (5th Cir. 2014) ........................................................... 24

*In re Citgo Petrol. Corp.,*
248 S.W.3d 769 (Tex. App.—Beaumont 2008, no pet.) ..................... 36

*City of Austin v. Powell*,
704 S.W.3d 437 (Tex. 2024) ................................................................ 45

*City of Fort Worth v. Rylie*,
602 S.W.3d 459 (Tex. 2020) ................................................................ 41

*ConocoPhillips Co. v. Graham*,
2012 WL 1059084 (Tex. App.—Houston [1st Dist.]
Mar. 29, 2012, no pet.) ............................................................ 27, 28, 29

*Dall. Farm Mach. Co. v. Reaves*,
307 S.W.2d 233 (Tex. 1957) ................................................................ 41

*In re E.C.R.*,
402 S.W.3d 239 (Tex. 2013) ................................................................ 45

*El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*,
389 S.W.3d 802 (Tex. 2012) ................................................................ 30

*Finley Res. Inc. v. Headington Royalty, Inc.*,
672 S.W.3d 332 (Tex. 2023) .......................................................... 36, 37

*First Bank v. Brumitt*,
519 S.W.3d 95 (Tex. 2017) .................................................................. 27

*First Nat'l Bank of Luling v. Nugent*,
384 S.W.2d 224 (Tex. App.—San Antonio 1964,
writ ref'd n.r.e) ................................................................................... 45

*In re FirstMerit Bank, N.A.*,
52 S.W.3d 749 (Tex. 2001) .................................................................. 42

*Forest Oil Corp. v. El Rucio Land & Cattle Co.*,
518 S.W.3d 422 (Tex. 2017) ................................................................ 45

*Forest Oil Corp. v. McAllen*,
268 S.W.3d 51 (Tex. 2008) .................................................................. 43

*Ghosh v. Grover*,
412 S.W.3d 749 (Tex. App.—Houston [14th Dist.]
2013, no pet.) ..................................................................................... 56

Page(s)

*Great Hans, LLC v. Liberty Bankers Life Ins. Co.*,
2019 WL 1219110 (Tex. App.—Dallas
Mar. 15, 2019, no pet.) ........................................................................... 41, 43

*Great Lakes Ins., S.E. v. Gray Grp. Invs., L.L.C.*,
76 F.4th 341 (5th Cir. 2023) ........................................................................ 48

*Haase v. Glazner*,
62 S.W.3d 795 (Tex. 2001) ......................................................................... 56

*Hooks v. Samson Lone Star, Ltd. P'ship*,
457 S.W.3d 52 (Tex. 2015) ......................................................................... 41

*Horizon Health Corp. v. Acadia Healthcare Co.*,
520 S.W.3d 848 (Tex. 2017) ................................................................... 51, 54

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
341 S.W.3d 323 (Tex. 2011) ........................................................................ 43

*Koerner v. CMR Constr. & Roofing, L.L.C.*,
910 F.3d 221 (5th Cir. 2018) ...................................................................... 24

*Malouf v. State ex rel. Ellis*,
694 S.W.3d 712 (Tex. 2024) ........................................................................ 48

*Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*,
26 F.3d 531 (5th Cir. 1994) ........................................................................ 29

*Morris v. House*,
32 Tex. 492 (1870) ...................................................................................... 41

*Nagle v. Nagle*,
633 S.W.2d 796 (Tex. 1982) ........................................................................ 55

*Ohio Cas. Ins. Co. v. Patterson-UTI Energy, Inc.*,
703 S.W.3d 790 (Tex. 2024) ........................................................................ 47

*Phila. Indem. Ins. Co. v. White*,
490 S.W.3d 468 (Tex. 2016) ........................................................................ 42

*Pizza Hut, LLC v. Ronak Foods, LLC*,
2022 WL 20564482 (E.D. Tex. Feb. 10, 2022) ............................................ 41

Page(s)

*S. Methodist Univ. v. S. Cent. Jurisdictional Conf. of the
United Methodist Church*,
716 S.W.3d 475 (Tex. 2025) ...................................................... 27

*Schlumberger Tech. Corp. v. Swanson*,
959 S.W.2d 171 (Tex. 1997) ...................................................... 43

*Sheet Pile, L.L.C. v. Plymouth Tube Co., USA*,
98 F.4th 161 (5th Cir. 2024) ............................................... 23, 50

*St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*,
78 F.3d 202 (5th Cir. 1996) ...................................................... 46

*Talman Home Fed. Sav. & Loan Ass'n of Ill. v.
Am. Bankers Ins.*,
924 F.2d 1347 (5th Cir. 1991) ................................................. 30

*TEC Olmos, LLC v. ConocoPhillips Co.*,
555 S.W.3d 176 (Tex. App.—Houston [1st Dist.]
2018, pet. denied) ...................................................................... 44

*Tex. Farmers Ins. Co. v. Gerdes*,
880 S.W.2d 215 (Tex. App.—Fort Worth 1994, writ denied) ............. 36

*Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*,
877 S.W.2d 276 (Tex. 1994) ................................................. 52, 54

*Tex. Prop. & Cas. Ins. Guar. Ass'n v. Sw. Aggregates, Inc.*,
982 S.W.2d 600 (Tex. App.—Austin 1998, no pet.) .......................... 46

*Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prods. Co.*,
448 F.3d 760 (5th Cir. 2006) .................................................... 38

*Transcor Astra Group S.A. v. Petrobras Am. Inc.*,
650 S.W.3d 462 (Tex. 2022) ..................................................... 43

*United States v. Gonzales*,
520 U.S. 1 (1997) ...................................................................... 44

*United States v. Throckmorton*,
98 U.S. 61 (1878) ...................................................................... 41

*United States v. Vonn*,
535 U.S. 55 (2002) ............................................................. 44, 45

Page(s)

*Victoria Bank & Tr. Co. v. Brady*,
811 S.W.2d 931 (Tex. 1991) ..................................................................43

*Vitol, Inc. v. United States*,
30 F.4th 248 (5th Cir. 2022) ................................................................43

*W. Loop Hosp., LLC v. Hou. Galleria Lodging Assocs., LLC*,
649 S.W.3d 461 (Tex. App.—Houston [1st Dist.]
2022, pet. denied) ..................................................................................36

*Waak v. Rodriguez*,
603 S.W.3d 103 (Tex. 2020) ..................................................................47

*Wal-Mart Stores, Inc. v. Xerox State & Local Sols., Inc.*,
663 S.W.3d 569 (Tex. 2023) ..................................................................30

*In re Weekly Homes, L.P.*,
180 S.W.3d 127 (Tex. 2005) ..................................................................42

*Wintz v. Morrison*,
17 Tex. 372 (1856) ................................................................................41

*Wood v. Wiggins*,
650 S.W.3d 533 (Tex. App.—Houston [1st Dist.]
2021, pet. denied) ..................................................................................55

*Zachry Const. Corp. v. Port of Hou. Auth.*,
449 S.W.3d 98 (Tex. 2014) ....................................................................47

## Statutes & Rules

Fed. R. Civ. P. 56 ......................................................................................23

Tex. Bus. & Com. Code § 2.201 ...............................................................55

Tex. Bus. & Com. Code § 26.01 ...............................................................55

Tex. Gov't Code § 311.005 .......................................................................46

Page(s)

**Treatises & Other Authorities**

Bryan A. Garner & Antonin Scalia,
*Reading Law* (2012) ........................................................................ 48
Restatement (Second) of Contracts § 304 (1981) .................................... 36
*Webster's Third New International Dictionary* (1976) ............................ 44

## INTRODUCTION

The district court correctly recognized that while the facts of this case are complicated, the legal rules that require summary judgment for GE are not. The plain text of an agreement between two sophisticated parties requires affirming summary judgment under long-settled principles of Texas contract law.

Alta Power—a new venture formed to develop power plants in Texas—entered an agreement with a company called WattStock to obtain equipment for its first project. But after nearly 90 lenders and investors refused to finance its project, Alta collapsed before construction began. Rather than accept why its risky venture failed to launch, Alta blames GE—alleging it made two false oral promises that induced Alta to enter the agreement with WattStock. Alta seeks a windfall of over $400 million in asserted lost profits for a high-risk venture that never got off the ground.

That lost-profits claim is foreclosed by the plain text of the agreement, which prohibits Alta from asserting "any claim" for "consequential damages"—including "loss of profit"—"arising out of or connected in any way" to the agreement. ROA.8056. The agreement explicitly extends that sweeping protection to the parties' "subcontractors."

1

ROA.8056. GE undisputedly fits within that category, so it can enforce the consequential-damages waiver. Alta's efforts to avoid that straightforward conclusion by imposing atextual limitations on the agreement's plain language find no purchase in Texas law, and the district court properly rejected them. What's more, Alta entered four other contracts—including two directly with GE—that compel the same conclusion.

The Court need go no further to affirm. But two additional, alternative grounds independently require affirming. *First*, Alta can't recover its alleged lost profits because they're too speculative as a matter of Texas law. *Second*, Alta's claims rest entirely on alleged oral promises that are legally barred by the statute of frauds.

The district court's well-reasoned decision granting summary judgment to GE should be affirmed.

# ISSUES PRESENTED

1.    Whether the district court properly granted summary judgment to GE because Alta's lost-profits claim is expressly barred by the plain language of a consequential-damages waiver enforceable by GE as an intended third-party beneficiary.

2.    Alternatively, whether summary judgment was proper on the additional, independent grounds that Alta's alleged lost profits are (a) impermissibly speculative as a matter of Texas law, and (b) based on alleged oral promises that the statute of frauds renders legally unenforceable.

## STATEMENT OF THE CASE

### I. Alta pursues a novel venture of building "peaker" power plants in Texas.

Alta was founded in 2017 for the sole purpose of developing natural gas-fired "peaker" plants—i.e., power plants designed to generate electricity during periods of "peak" demand. ROA.7680–81, 7710, 13605. To move from concept to commercial operation, peaker-plant developers like Alta need a site for the plant; turbines (among other equipment); and engineering, procurement, and construction contractors. ROA.7681, 8760, 13605–07. In Alta's case, it also needed financiers willing to back its expensive (and risky) venture. *See* ROA.7713, 13606.

Alta hadn't built a peaker plant before—and hasn't to this day. *See* ROA.7743–44. Alta claims that, if successful, it would've been a "first mover" in the market. ROA.7681, 7711. But competitors that had tried to build peaker plants struggled to secure financing without a warranty from the original turbine manufacturer. ROA.7764–66; *see also* ROA.8769.

### II. GE and WattStock work together to offer refurbished and warrantied GE gas turbines.

Peaker plants often use turbines adapted from aircraft jet engines because they can start up and shut down quickly and efficiently.

ROA.7680–81, 13605.  GE is a manufacturer of these turbines. ROA.7884.  As a less expensive alternative to purchasing new turbines, GE offers a program called TruePackage that enables developers to purchase fully refurbished GE turbines backed by a GE warranty. ROA.8162.  As a result, TruePackage also addresses concerns that often deter lenders from financing peaker plants.  *See* ROA.8180–81.

GE implemented the TruePackage program in collaboration with a company called WattStock, which provided services to power plant developers, owners, and operators.  ROA.7871–75.  In 2017, GE and WattStock executed a Memorandum of Understanding (MOU). ROA.7871–75.  By its terms, the MOU didn't "create any partnership, corporation, agency or fiduciary relationship" between GE and WattStock—it simply formalized their collaboration in providing refurbished turbines to developers hoping to purchase them more affordably.  ROA.7874, 7882.

As reflected in the MOU, developers could choose to implement the TruePackage program in one of two ways:  (1) WattStock could serve as the lead contractor, with GE as its subcontractor, or (2) GE could serve as the lead, with WattStock as its sub.  ROA.7871–74, 7888–89.  When

GE took the lead, it charged a premium for that arrangement. ROA.7884, 7888–89. As a result, prospective TruePackage customers often preferred to use WattStock as the lead contractor so they could avoid GE's premium while still enjoying GE-warrantied turbines. *See* ROA.7884–89.

**III. Alta enters contracts with WattStock and GE that expressly waive Alta's ability to seek consequential damages.**

Alta and WattStock met for the first time in May 2018 to discuss the TruePackage program. ROA.7898. Alta claims that WattStock and GE representatives orally promised—at their initial meeting and again at "every" biweekly Alta-WattStock meeting that followed—that they would deliver "nine fully refurbished TruePackages for 10 million or less per unit." ROA.7662, 7898–99. Alta also claims that WattStock and GE repeatedly represented that GE would "stand behind" WattStock's contractual obligations to Alta if WattStock defaulted. ROA.7662.[1]

According to Alta, those representations induced it in early 2019 to enter into an agreement with WattStock. ROA.2046–51, 20491–92. Alta had the opportunity to partner with ProEnergy—another established

---

[1] GE (and WattStock) disagree with Alta's allegation that representatives from GE attended the first meeting between Alta and WattStock, but for summary-judgment purposes that disagreement is immaterial.

peaker-plant developer.  ROA.7758, 7768, 7776.  But Alta declined because ProEnergy "was a direct competitor" that developed its own peaker plants.  ROA.7758, 7761.  Alta instead decided to pursue TruePackage turbines through WattStock.  ROA.7683–88, 7898, 14713.

Alta and WattStock memorialized the terms of their deal in a written Master Agreement.  ROA.8049–60.  That agreement described the relationship between Alta and WattStock, ROA.8049, 8052–53, and how WattStock would identify and purchase turbines for Alta's project, ROA.7723–25, 8051–52.

The Master Agreement didn't require Alta to purchase any turbines identified by WattStock.  ROA.8052–53.  Instead, Alta would execute a separate "definitive" agreement setting out the "scope, terms, and price" for each turbine purchase.  ROA.8052.  The Master Agreement clarified that prices "may vary due to the variable conditions of each Asset and the variable scopes of refurbishment work."  ROA.8052.

The Master Agreement featured a waiver of consequential damages that is key to this appeal.  In Section 9.1(B), Alta and WattStock agreed not to make "*any* claim" against each other or their "contractors or subcontractors" for "*any* . . . consequential damages arising out of or

connected in *any* way" to the agreement, "includ[ing]" but "not limited to" "loss of profit" from "*any* cause of action."

> B. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY, THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, REPRESENTATIVES, CONTRACTORS OR SUBCONTRACTORS SHALL BE LIABLE TO THE OTHER OR SHALL MAKE ANY CLAIM FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR CONNECTED IN ANY WAY TO THIS AGREEMENT. THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES SHALL INCLUDE, BUT IS NOT LIMITED TO, LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM ANY CAUSE OF ACTION INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT AND BREACH OF STRICT OR IMPLIED WARRANTEE.

ROA.8056 (emphases and highlighting added).

The parties also agreed to a separate liability cap in Section 9.1(A)—limiting their liability to $100,000 for "any and all claims, losses, costs, damages of any nature whatsoever or claims expenses from any cause or causes, including attorneys' fees and costs and expert-witness fees and costs." ROA.8056.

Alta and WattStock subsequently amended the Master Agreement on February 5, 2020, but the key provisions—the consequential-damages waiver in Section 9.1(B) and the limitation of liability provision in Section 9.1(A)—remained unchanged. ROA.21075–76.

Along with the Master Agreement, Alta entered several other contracts with GE and WattStock. With GE, Alta executed two

nondisclosure agreements—one in 2018, and one in 2020. ROA.8037–40 (2018 NDA); ROA.23701–04 (2020 NDA). The 2020 NDA, like the Master Agreement, contained a sweeping consequential-damages waiver:

> 11. In **no event** shall either Party be liable for **loss of profit** or revenues, loss of use, cost of capital, or for **any** special, **consequential,** incidental, indirect, punitive or exemplary **damages, regardless of whether a claim is based in** contract, warranty, indemnity, tort/extra-contractual liability (including negligence), strict liability **or otherwise.** Each Party acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement. Accordingly, in the event of any such breach, in addition to any other remedies at law or in equity that a Party may have, it shall be entitled to equitable relief, including injunctive relief or specific performance, or both.

ROA.23704 (highlighting added). So, too, did the 2018 NDA:

> 11. In **no event** shall either Party be liable for **loss of profit** or revenues, loss of use, cost of capital, or for **any** special, **consequential,** incidental, indirect, punitive or exemplary **damages, regardless of whether a claim is based in** contract, warranty, indemnity, tort/extra-contractual liability (including negligence), strict liability **or otherwise.** Each Party acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement. Accordingly, in the event of any such breach, in addition to any other remedies at law or in equity that a Party may have, it shall be entitled to equitable relief, including injunctive relief or specific performance, or both.

ROA.8040 (highlighting added).

Separately, with WattStock, Alta executed two purchase orders (or Limited Notices to Proceed) for certain turbines. ROA.8062–76, 8083–84. Both contained their own consequential-damages waivers:

> 4. **Neither Party** is liable for **any** incidental or **consequential damages, including lost profits,** sales, marketing, or proposal efforts **arising in relation to this LNTP.**

ROA.8083 (highlighting added).

> **22. Limitation of Liability**
> 22.1. Limitation.
> 22.1.1. The total liability of the Seller for all claims arising out of or relating to the performance or breach of the Contract or use of any Equipment shall not exceed the portion of the Contract Price allocable to the portion of the Equipment giving rise to the claim. The Seller's liability shall terminate at the end of the Warranty Period for the Equipment giving rise to the claim. The Buyer may enforce a claim that accrued before that date by commencing an action, as applicable under the dispute resolution clause, before the expiration of the applicable statute of limitations or repose, but not later than ninety (90) Days after the expiry of the Warranty Period.
> **22.2. Consequential Damages.**
> 22.2.1. The Seller **shall not be liable** for **loss of profit** or revenues, loss of product, loss of use of the Work or any associated equipment, interruption of business, cost of capital, cost of replacement equipment, downtime costs, increased operating costs, claims of the Buyer's customers for such damages, **or** for **any** special, **consequential,** incidental, indirect, punitive or exemplary **damages**.

ROA.8073 (highlighting added). And one expressly extended the benefits of that waiver to third parties:

> 34.1. **Third-Party Beneficiaries.**
> 34.1.1. Except as provided in the Article entitled "Limitation of Liability", these provisions are for the benefit of the Parties hereto and not for any other third party.

ROA.8075 (highlighting added).

Neither the Master Agreement, the NDAs, nor the purchase orders suggested that GE or WattStock would sell Alta nine TruePackage units for $10 million or less. None contained any language suggesting that GE would assume WattStock's contractual obligations if WattStock defaulted,

either.  Instead, Alta expressly acknowledged in a separate agreement with WattStock called the Cancellation Fee Agreement that GE was WattStock's subcontractor on Alta's proposed peaker project: "Important components of WattStock's work . . . will be ***subcontracted*** to GE." ROA.8080 (emphasis added); *see also* ROA.21087 (representing that GE is a WattStock "Major Subcontractor"); ROA.21138 (same).

## IV.   Alta's peaker-plant venture fails for reasons unrelated to GE or WattStock.

Alta sought financing for its peaker-plant venture from nearly 90 lenders and investors.  ROA.7737–38.  But only two even came close to lending—Deutsche Bank and Starwood.  ROA.7712–13.  Both ultimately refused to finance Alta's venture, concluding that its risks outweighed its promise.  *See* ROA.7712–13, 8756–59, 8762, 8778.

### A.   Deutsche Bank declines to finance Alta's venture.

Deutsche Bank's primary concern was that Alta didn't have enough equity in the project.  ROA.8759.  So Deutsche Bank required Alta to contribute equity equal to 10 percent of the project's construction costs. ROA.8757–59, 8856.  That meant Alta needed to raise an additional $15 million.  ROA.8004–05.  But Alta never came up with the cash.  *See* ROA.8762, 8970.

11

Deutsche Bank was also concerned about the $400,000 settlement Alta paid to avoid litigation with a peaker-plant competitor. ROA.8756–57, 8955, 8957. Alta had hired two of the competitor's employees, who previously had signed binding noncompetes with their former employer. ROA.7753, 13714. The competitor alleged not only that its former employees' work with Alta violated the noncompetes, but also that the employees had stolen trade secrets and shared them with Alta. ROA.8858–59. Deutsche Bank was concerned about "the facts" of this dispute and ultimately uncomfortable with the terms of Alta's settlement. ROA.8957; *see also* ROA.8756–57, 8955.

Deutsche Bank was also curious about whether GE would guarantee performance of the Master Agreement if WattStock defaulted. ROA.14727–29. In response, Alta forwarded a letter from GE explaining that GE was WattStock's "subcontractor" and would complete its outstanding work only "subject to several considerations." ROA.8964. Unsurprisingly, Deutsche Bank understood that GE didn't have "an unconditional obligation to step into WattStock's contract in the event of a WattStock default." ROA.14710.

**B.    Starwood also declines to back Alta's venture.**

Starwood shared some of Deutsche Bank's concerns—and had others of its own.  Like Deutsche Bank, "one of the reasons why Starwood didn't provide financing for Alta Power's project was because Alta didn't have sufficient equity for the project."  ROA.8776.

Starwood was also considering Alta's venture at the same time that the World Health Organization declared COVID-19 a global pandemic.  ROA.8778, 9008–10.   Given the "major impact" of COVID-19 on Starwood's real-estate business, Starwood placed "an internal moratorium" on all new investments.  ROA.8778.  So COVID-19 was another key reason Starwood decided not to finance Alta's venture.  ROA.8777–78.

**V.   Alta unilaterally terminates its contracts with WattStock, prompting this litigation.**

By June 2020, Alta had been rejected by 88 lenders—including Deutsche Bank and Starwood—and had no remaining financing prospects.  *See* ROA.7712, 8762, 8778, 9092–93.  Out of options, Alta unilaterally terminated its agreements with WattStock, claiming that WattStock had breached the Master Agreement and purchase orders.  ROA.9017–18.

Litigation followed. WattStock sued Alta for what it was owed under the Master Agreement and purchase orders. ROA.9098–9110. Alta countersued, asserting tort and contract claims. ROA.9179–86. Notably absent from Alta's complaint was any mention of the oral promises now at the heart of Alta's case against GE. ROA.9172–86.

After the WattStock-Alta litigation kicked off, Alta asked GE to contract with it directly to service the peaker-plant venture. ROA.9195–97. GE declined, explaining that it still "ha[d] a contractual obligation to provide parts and services to WattStock." ROA.9196. GE was concerned that a direct contract with Alta would violate that agreement. ROA.9196.

Alta retaliated by adding GE as a third-party defendant, alleging that GE was responsible for WattStock's alleged breach of contract on the theory that "GE is an 'affiliate' or 'representative' of WattStock and, therefore, *a party to the Master Agreement*." ROA.9199, 9208 (emphasis added). Under Alta's own theory, GE—as "a party to the Master Agreement"—would be able to enforce its terms, including the consequential-damages waiver. ROA.9208.

In 2021, WattStock filed for bankruptcy and removed this case to federal court. ROA.9227–31. Alta and WattStock then settled and

14

voluntarily dismissed their claims against each other with prejudice, leaving only Alta and GE. *See* ROA.9233–34.

Alta pressed vicarious-liability and civil-conspiracy theories against GE to make it liable for WattStock's "breaches." ROA.7698–99, 7702–03. Alta based those claims on two alleged oral promises: (1) "to deliver at least nine TruePackage units for $10 million or less;" and (2) to "fulfill WattStock's obligations under any contractual relationship that WattStock had with Alta Power." ROA.7660–61.

Alta alleged that but for GE and WattStock's alleged oral misrepresentations, Alta would have earned between $193.6 and $407.3 million in supposed profits by capitalizing on the surge in demand during Winter Storm Uri. ROA.9360. But as GE pointed out below, that would have required Alta to have (1) secured financing, (2) actually built the power plant, (3) started operating it before Winter Storm Uri hit, and (4) operated the plant continuously during Winter Storm Uri, even while most other gas-fired plants in Texas went offline. ROA.23675–80.

## VI. The district court grants GE summary judgment.

GE and Alta filed cross-motions for summary judgment, both requesting judgment under the Master Agreement's consequential-

damages waiver.  ROA.7553–7611 (GE); ROA.20480–20514 (Alta).  The district court granted GE summary judgment and denied Alta's motion. ROA.23856.

In the district court's view, this "intensely complex case . . . has an exceedingly straightforward answer."  ROA.23857.  That answer, the court concluded, lies in the plain text of the Master Agreement. ROA.23857.  The district court analyzed the Master Agreement, highlighting two key aspects of the consequential-damages waiver.

*First*, the court highlighted the waiver's breadth.  The court observed that "the parties to the agreement agreed to not make any claim for any consequential damages arising out of or connected in any way" to the Master Agreement.  ROA.23859–60 (quoting ROA.8056) (internal quotation marks omitted).  The court noted that the parties also specifically defined "consequential damages" to include the "loss of profits."  ROA.23860.

*Second*, the court underscored that the waiver expressly applied to third parties—including GE.  The waiver specifies that it applies not only to the contracting parties, but also to "their respective officers, directors, partners, employees, representatives, contractors or subcontractors." ROA.23859 (quoting ROA.8056).  Relying on that language, the district

16

court concluded that GE—as WattStock's subcontractor—"is an intended third-party beneficiary" of the Master Agreement. ROA.23860–66. As a result, GE can enforce the consequential-damages waiver to bar Alta from recovering any purported lost profits. *See* ROA.23866.

None of Alta's contrary arguments altered the district court's conclusion.

**1.** Alta argued that GE couldn't enforce the waiver because GE wasn't a subcontractor for WattStock when Alta and WattStock executed the Master Agreement or when GE made the alleged oral promises underlying Alta's claims. ROA.23860–62. But the district court explained that specific "subcontractors" needn't be known at the time of the contract's execution—and the term "subcontractors" was sufficiently clear and specific to confer a direct benefit to entities falling within the category. *See* ROA.23860–62.

The district court also rejected Alta's argument that GE's alleged conduct fell outside the waiver's scope, pointing out that by its plain, sweeping terms, the waiver covers "any incidental, indirect or consequential damages arising out of or ***connected in any way*** to this agreement." ROA.23862 (quoting ROA.8056) (emphasis added). According

17

to Alta's own theory, GE's purported fraud led Alta to execute the Master Agreement.  ROA.23862.  This alleged conduct, the district court concluded, was easily "connected in some way" to the Master Agreement.  ROA.23862.

**2.** The district court also rejected Alta's argument that its fraud allegations necessarily invalidated the Master Agreement, ROA.23865, holding that the Texas Supreme Court's decision in *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213 (Tex. 2019), foreclosed that argument.  ROA.23865–66.

In *Bombardier*, the Texas Supreme Court addressed facts similar to this case and reiterated that Texas courts "must respect and enforce the terms of a contract that the parties have freely and voluntarily made."  ROA.23865–66 (quoting *Bombardier*, 572 S.W.3d at 232).  The *Bombardier* court clarified that the Texas Supreme Court has "never held . . . that fraud vitiates a limitation-of-liability clause."  ROA.23865 (quoting *Bombardier*, 572 S.W.3d at 232).  So under *Bombardier*, "claiming fraud isn't enough to get through the waiver."  ROA.23865.

**3.** The district court rejected Alta's alternative argument that the waiver didn't apply to intentional torts, ROA.23863–64, citing the waiver's sweeping language, which covers "any consequential damages

18

arising from any cause of action—whether it be breach of contract, fraud, negligence, or otherwise." ROA.23864. Any other reading, the court explained, would require it "to rewrite" the contract—a "role" the court wasn't willing to play. ROA.23864.

## SUMMARY OF THE ARGUMENT

**I.** The district court correctly held that the plain language of the Master Agreement prohibits Alta from recovering its claimed lost profits as a matter of law.

**A.** Alta and WattStock—sophisticated entities represented by counsel in an arms-length transaction—agreed to a sweeping consequential-damages waiver that bars "***any*** claim" for "***any*** . . . consequential damages" "connected in ***any*** way" to the Master Agreement. ROA.8056 (emphases added). The waiver defines "consequential damages" to include "loss of profit" and expressly extends its protection to the parties' "contractors or ***subcontractors***." ROA.8056 (emphasis added). As WattStock's undisputed subcontractor, GE falls squarely within that covered category and, as an intended third-party beneficiary, may enforce the waiver against Alta.

19

**B.** The Master Agreement isn't the only contract in which Alta waived its ability to seek consequential damages from GE. Alta also signed two NDAs directly with GE and two purchase-order agreements with WattStock that feature mutual waivers of consequential damages that expressly prohibit Alta from seeking lost profits. These other contracts confirm what the Master Agreement makes plain—Alta's claim for lost profits is barred as a matter of law, as the district court correctly held.

**C.** Alta's counter-arguments require this Court to rewrite the Master Agreement, ignore Texas law, or both. The district court correctly rejected Alta's attempt to (1) engraft two atextual limitations to the waiver's plain language; (2) rely on its fraud allegations to vitiate the waiver; and (3) create an "intentional" tort carveout from the waiver.

**1.** Crucially, Alta doesn't dispute that a subcontractor can invoke the Master Agreement's consequential-damages waiver. It doesn't dispute that GE was WattStock's subcontractor. And it doesn't dispute that its claim is "connected" to the Master Agreement. ROA.8056. So Alta effectively concedes that its lost-profits claim against GE comes within the plain language of the consequential-damages waiver.

20

That leaves Alta inviting this Court to engraft two atextual limitations onto the plain, sweeping language of the waiver—the first a capacity limitation that would rewrite the waiver to apply only to conduct GE carried out in its capacity as a subcontractor, and the second a temporal limitation that would rewrite the waiver to exclude conduct predating the Master Agreement. Both theories should be rejected because they seek to impose limits found nowhere in the agreement's plain language or Texas law, and if accepted would essentially render the waiver a dead letter.

2. Alta's argument that its allegations of fraud automatically invalidate the consequential-damages waiver is foreclosed by the Texas Supreme Court's *Bombardier* decision. There, the Texas Supreme Court held that where, as here, sophisticated parties bargain for a limitation-of-liability clause, courts must respect and enforce those terms. 572 S.W.3d at 232.

3. Finally, Alta argues that the consequential-damages waiver excludes intentional torts—but that argument hides a request to rewrite the contract under a textualist flag. Nothing in the text of the agreement distinguishes between intentional and unintentional torts. Instead, the

21

waiver uses broad, categorical terms that admit no exceptions: No party may recover consequential damages "connected in any way" to the Master Agreement—full stop. ROA.8056. That includes Alta's claim for lost profits.

**II.** The Court need go no further to affirm summary judgment in GE's favor. But summary judgment also rests on two additional, alternative grounds the district court had no need to reach.

**A.** Alta's claimed lost profits are impermissibly speculative as a matter of settled Texas law. Alta never secured financing, never built or operated a peaker plant, and never earned revenue. Its lost-profits model depends entirely on a multi-link chain of events that never occurred—not only securing financing, building the power plants, and bringing them online before Winter Storm Uri hit, but also operating the plants flawlessly during the unprecedented storm. Alta can't establish a single one of those assumptions—let alone all of them—with the certainty Texas law requires to recover lost profits. *See Am. Midstream (Ala. Intrastate), LLC v. Rainbow Energy Mktg. Corp.*, 714 S.W.3d 572, 583–84 (Tex. 2025).

**B.** The statute of frauds is independently fatal to Alta's claims. Those claims turn on allegations that GE and Wattstock orally promised

to (1) deliver nine TruePackage units for $10 million or less, and (2) assume WattStock's obligations if WattStock defaulted. But neither purported promise was ever reduced to writing in this heavily papered relationship. Both oral promises fall within the statute of frauds—the first as a sale of goods exceeding $500, and the second as a promise to answer for another's debt. Alta can't avoid that conclusion by recasting an unenforceable contract claim as fraud. *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007). Summary judgment was proper for that reason, too.

## STANDARD OF REVIEW

This Court reviews orders granting summary judgment de novo. *Sheet Pile, L.L.C. v. Plymouth Tube Co., USA*, 98 F.4th 161, 165 (5th Cir. 2024). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A moving party can carry its summary-judgment burden by identifying "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party to show "there is a genuine issue for

23

trial." *Celtic Marine Corp. v. James C. Justice Cos.*, 760 F.3d 477, 481 (5th Cir. 2014). "[S]elf-serving," "speculat[ive]," or "conclusory" assertions are "insufficient" on their own to carry that burden. *Koerner v. CMR Constr. & Roofing, L.L.C.*, 910 F.3d 221, 227–28 (5th Cir. 2018).

**ARGUMENT**

## I. Summary judgment was proper because the Master Agreement's plain language bars lost profits.

The district court got it right. "This intensely complex case . . . has an exceedingly straightforward answer." ROA.23857. In its Master Agreement with WattStock, Alta expressly waived its ability to recover "consequential damages"—including "loss of profit"—from "subcontractors" like GE. ROA.8056. Alta's attempts to take pencil and eraser to that waiver must be rejected.[2]

---

[2] In its quest to rewrite the Master Agreement, Alta's brief also takes liberties with the record:

- Alta suggests (at 20, 34, 38) that the waiver argument was the tail wagging the dog below, but it was GE's lead argument for summary judgment and front-and-center in the briefing. *See* ROA.7570–72, 7588, 21036, 21044, 23663–66.

- Alta claims (at 13) that contract-termination fees associated with certain turbines were hidden, but as Alta's own chief operating officer testified: "I don't think that WattStock was ever trying to hide termination fees from us." ROA.419–20.

[*footnote continued on next page*]

24

**A. The Master Agreement's consequential-damages waiver bars Alta from seeking lost profits from GE.**

Alta and WattStock—sophisticated entities represented by counsel in an arms-length transaction—agreed to a "sweeping" consequential-damages waiver. ROA.23859; *see also* ROA.8057 ("Each Party hereto has been represented by counsel and participated in the drafting of this Agreement."); ROA.2742–43 (Alta's chief financial officer admitting that Alta was represented by a "project finance lawyer").[3] Section 9.1(B) of that agreement bars "any claim" for "any . . . consequential damages" "connected in any way to" the agreement. ROA.8056.

That waiver applies to not only Alta and WattStock, but also their "contractors or ***subcontractors***." ROA.8056 (emphasis added). The agreement's plain language leaves no room for doubt about its scope,

---

- Alta maintains (at 2, 5–8) that GE had a "monopoly on turbines," but Alta repeatedly acknowledged that ProEnergy offered the same products, ROA.7761; *see also* ROA.7754–55, 7758, 1365; and admitted that it "didn't go with ProEnergy because ProEnergy had developed a site of their own at the time" and was "a direct competitor." ROA.7758.

[3] Alta doesn't dispute (at 22)—and its case confirms—that parties may contractually limit consequential damages. *See Allright, Inc. v. Elledge*, 515 S.W.2d 266, 267–68 (Tex. 1974).

providing that none of those parties "shall be liable" or "make any claim" for "loss of profit" or "any other consequential damages":

> B. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY, THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, REPRESENTATIVES, CONTRACTORS OR SUBCONTRACTORS SHALL BE LIABLE TO THE OTHER OR SHALL MAKE ANY CLAIM FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR CONNECTED IN ANY WAY TO THIS AGREEMENT. THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES SHALL INCLUDE, BUT IS NOT LIMITED TO, LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM ANY CAUSE OF ACTION INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT AND BREACH OF STRICT OR IMPLIED WARRANTEE.

ROA.8056 (highlighting added).

Alta's lost-profits claim seeks to recover from GE Alta's losses incurred from entering into the Master Agreement. ROA.7699, 7702, 7705, 7690, 7696, 9199, 9208. So Alta's claims are at the very least "connected" in some "way" to the Master Agreement under Section 9.1(B)—they go to the very heart of it. ROA.8056. As a result, the consequential-damages waiver bars Alta's effort to recover any purported "loss of profit."

GE is entitled to enforce that waiver against Alta as an intended third-party beneficiary of the Master Agreement. It's a "[w]ell-established" rule that nonparties qualifying as third-party beneficiaries may enforce an agreement they didn't sign. *S. Methodist Univ. v. S. Cent.*

26

*Jurisdictional Conf. of the United Methodist Church*, 716 S.W.3d 475, 489 (Tex. 2025). A nonparty qualifies as a third-party beneficiary if (1) the contracting parties "intended to secure a benefit" to the nonparty, and (2) the contracting parties executed the contract "directly" for the nonparty's benefit. *ConocoPhillips Co. v. Graham*, 2012 WL 1059084, at *6 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, no pet.).[4]

This two-prong inquiry turns "on the contracting parties' intent." *S. Methodist Univ.*, 716 S.W.3d at 489. Texas courts ascertain that intent by looking "solely to the contract's language, construed as a whole." *BFS Grp. LLC v. De Leon*, --- S.W.3d. ----, 2025 WL 2394091, at *11 (Tex. App.—Houston [14th Dist.] Aug. 19, 2025, pet. filed); *see also Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019) (contract's "plain, grammatical meaning" governs). Where, as here, that meaning is "certain and definite," Texas courts construe the contract "as a matter of law." *Barrow-Shaver*, 590 S.W.3d at 479, 483.

---

[4] Alta emphasizes (at 26) the "general rule" that only contracting parties benefit from their contract. *See First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017). But it doesn't dispute that, as the Texas Supreme Court has recognized, contracting parties can secure benefits to others as well—as the parties did here. *See S. Methodist Univ.*, 716 S.W.3d at 489.

**1.** The first requirement for third-party beneficiary status— intent to secure a benefit for the third party—is evident from Section 9.1(B)'s plain text. Section 9.1(B) expressly extends the consequential-damages waiver beyond the contracting parties to "their respective officers, directors, partners, employees, representatives, contractors or ***subcontractors***." ROA.8056 (emphasis added). This provision identifies specific "categor[ies] of persons" to whom the waiver's protections apply. *Graham*, 2012 WL 1059084, at *6. A third-party beneficiary needn't be "expressly identified by name" so long as it's included "by class or category of persons." *Id.* That's the case here.

As Alta itself has repeatedly recognized, GE was WattStock's subcontractor. *See, e.g.*, ROA.21087 (Alta designating GE as a "Major Subcontractor" while negotiating with WattStock); ROA.8963–65 (letter emailed by Alta CFO Matthew Laterza to Deutsche Bank identifying GE as "a subcontractor to WattStock"); ROA.8080–81 (Cancellation Fee Agreement, drafted and signed by Alta, acknowledging that "[i]mportant components of WattStock's work . . . will be subcontracted to GE"). Even now, Alta "agree[s]" (at 20) that "GE became WattStock's subcontractor." As WattStock's subcontractor, GE may enforce the waiver.

28

**2.** The second requirement—that Alta and WattStock executed the Master Agreement directly for GE's benefit—is also satisfied. Notably, Texas law doesn't require that the Master Agreement have been executed "solely" for GE's benefit—just that the benefit to GE be "more than merely incidental." *Graham*, 2012 WL 1059084, at \*6. That, too, is the case here.

The consequential-damages waiver doesn't mention subcontractors in passing—they appear in the heart of the waiver provision. The text explicitly shields "subcontractors" from "any claim" for "any" "consequential damages" "connected in any way to" the Master Agreement. ROA.8056. By extending the waiver's protection to subcontractors, Alta and WattStock ensured that entities like GE would enjoy the same protection as the contracting parties themselves.[5]

---

[5] GE's burden to establish itself as a third-party beneficiary may be a "heavy" one, Alta Br. 26–27 (quoting *Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531, 540 (5th Cir. 1994), and citing *Talman Home Fed. Sav. & Loan Ass'n of Ill. v. Am. Bankers Ins.*, 924 F.2d 1347, 1351 (5th Cir. 1991)), but it's easily satisfied here because all parties agree that GE was WattStock's subcontractor.

In sum, this case begins and ends with the text.[6] The Master Agreement's consequential-damages waiver bars Alta's claim for lost profits, and GE can enforce that waiver against Alta as an intended third-party beneficiary—just as the district court correctly held.

**B.      The Master Agreement wasn't the only contract in which Alta waived consequential damages.**

The Master Agreement's consequential-damages waiver is hardly a one-off. While that waiver alone requires affirmance, Alta entered four other contracts—two with GE and two with WattStock—containing similarly broad consequential-damages waivers. These waivers further vindicate the district court's conclusion that Alta cannot recover any purported lost profits.

Like the Master Agreement's consequential-damages waiver, the 2020 NDA's waiver is sweeping. By its text, neither GE nor Alta shall be liable for "loss of profit" or "any" consequential damages:

---

[6]   No one disputes, as Alta points out (at 21), that context matters. *See Wal-Mart Stores, Inc. v. Xerox State & Local Sols., Inc.*, 663 S.W.3d 569, 578 (Tex. 2023); *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012). But that interpretive principle is no license to override plain text. If anything, the context favors GE.

> 11. In no event shall either Party be liable for loss of profit or revenues, loss of use, cost of capital, or for any special, consequential, incidental, indirect, punitive or exemplary damages, regardless of whether a claim is based in contract, warranty, indemnity, tort/extra-contractual liability (including negligence), strict liability or otherwise. Each Party acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement. Accordingly, in the event of any such breach, in addition to any other remedies at law or in equity that a Party may have, it shall be entitled to equitable relief, including injunctive relief or specific performance, or both.

ROA.23704 (highlighting added). The scope of the NDA's waiver is equally broad. It applies "regardless of whether [Alta's] claim is based in contract, warranty, indemnity, tort/extra-contractual liability (including negligence), strict liability or otherwise." ROA.23704.

The other three contracts bar Alta's lost-profits claim, too. All three contain similarly broad consequential-damages waivers:

> 11. In no event shall either Party be liable for loss of profit or revenues, loss of use, cost of capital, or for any special, consequential, incidental, indirect, punitive or exemplary damages, regardless of whether a claim is based in contract, warranty, indemnity, tort/extra-contractual liability (including negligence), strict liability or otherwise. Each Party acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement. Accordingly, in the event of any such breach, in addition to any other remedies at law or in equity that a Party may have, it shall be entitled to equitable relief, including injunctive relief or specific performance, or both.

ROA.8040 (highlighting added) (2018 GE-Alta NDA).

> 4. Neither Party is liable for any incidental or consequential damages, including lost profits, sales, marketing, or proposal efforts arising in relation to this LNTP.

ROA.8083 (highlighting added) (Alta-WattStock purchase order).

31

> **22.2. Consequential Damages.**
>
>     22.2.1. The Seller shall not be liable for loss of profit or revenues, loss of product, loss of use of the Work or any associated equipment, interruption of business, cost of capital, cost of replacement equipment, downtime costs, increased operating costs, claims of the Buyer's customers for such damages, or for any special, consequential, incidental, indirect, punitive or exemplary damages.

ROA.8073 (highlighting added) (Alta-WattStock purchase order). And they're all crystal clear: There can be "no" liability for "any" "consequential damages"—including "loss of profit." ROA.23704; *see also* ROA.8073, 8083.

Like the Master Agreement, these four contracts were executed by "sophisticated entities" in "an arms-length transaction"—and Alta affirmatively "bargained" for a comprehensive consequential-damages waiver. *Bombardier*, 572 S.W.3d at 234. Each of these contracts further confirms what the Master Agreement makes plain—Alta is barred from seeking lost profits from GE.[7]

---

[7] Alta's reliance (at 3, 33) on two orders denying motions to dismiss *in this case* is irrelevant and overblown. Both are single-page orders without any reasoning. *See* Order, *WattStock, LLC v. Alta Power LLC*, No. DC-20-08331 (116th Dist. Ct., Dallas Cty., Tex. May 18, 2021), available on the bankruptcy court's docket, No. 21-03083 (Bankr. N.D. Tex.), Dkt. No. 1-4, at 329; Order at 2, *WattStock, LLC v. Alta Power LLC*, No. 21-03083 (Bankr. N.D. Tex. May 31, 2022), Dkt. No. 47 (bankruptcy-court order denying Rule 12(c) motion).

### C. Alta can't evade the Master Agreement's plain text.

Alta presses three arguments for reversal, but none can override plain text and settled law.

**1.** Crucially, Alta doesn't dispute that a subcontractor can invoke the Master Agreement's consequential-damages waiver. It doesn't dispute that GE was a subcontractor of WattStock. And it doesn't dispute that its claim is "connected" to the Master Agreement. ROA.8056.

None of that is surprising. Below, Alta repeatedly recognized that GE was WattStock's subcontractor. ROA.20501–02, 21250, 23068. Alta also contended (when it previously tried to enforce the Master Agreement) that GE and WattStock were "partners"—conceding that the consequential-damages waiver applied to GE in that capacity as well. ROA.8056, 9218–19. Indeed, Alta's whole theory in adding GE as a third-party defendant was that GE was responsible for WattStock's alleged breach of contract because, as Alta alleged, "GE is an 'affiliate' or 'representative' of WattStock and, therefore, *a party to the Master Agreement*." ROA.9208 (emphasis added).

Alta can't have it both ways by previously insisting (contrary to all record evidence) that GE was somehow WattStock's "partner" or "party

to the Master Agreement" while now trying to evade the consequential-damages waiver, which expressly applies to "partners" as well as "subcontractors."  So Alta knows it cannot meaningfully dispute that GE comes within the plain terms of the consequential-damages waiver.  Instead, Alta insists (at 28) that GE can't invoke the waiver because Alta seeks to hold GE liable for conduct that wasn't carried out in GE's capacity as a subcontractor.  There are serious problems with that shell-game argument.

For one thing, Alta's capacity limitation appears nowhere in Section 9.1(B), and there's no basis for grafting it onto the text.  Texas courts discern "the contracting parties' intent" by looking "solely to the contract's language."  *BFS*, 2025 WL 2394091, at *11.  The Master Agreement's language imposes only *one* limitation on a party's ability to enforce the waiver—the claim must be "connected" to the Master Agreement.  ROA.8056.  Alta doesn't dispute that requirement is satisfied here.

Instead, Alta argues (at 32) that its capacity limitation is implicit—a "baseline requirement" of Section 9.1(B)—because, Alta suggests, without it the waiver would sweep too broadly.  Not so.  Section 9.1(B)

ties the scope of the waiver by subject matter to the Master Agreement. ROA.8056. The alleged conduct here—purportedly inducing Alta to enter the Master Agreement—goes to the heart of that agreement. In contrast, a third-party beneficiary like GE couldn't invoke the waiver for claims arising from a different project or a business relationship unrelated to the Alta-WattStock deal.

If anything, it's **Alta's** atextual capacity theory that has no limiting principle—essentially rendering the agreed-to waiver a dead letter. That's because it will nearly always be possible to frame a claim as one based on conduct outside the scope of one's role, thereby avoiding the waiver by engaging in what amounts to creative pleading. At bottom, Alta's theory, if accepted, would rewrite the waiver—if not erase it from the Master Agreement entirely.

For another thing, Texas law provides no support for Alta's atextual theory for avoiding the waiver's plain language. Texas courts have long held that a third-party beneficiary like GE "steps into the shoes" of the contracting parties and enjoys the same right to enforce the agreement as the signatories. *Tex. Farmers Ins. Co. v. Gerdes*, 880 S.W.2d 215, 218 (Tex. App.—Fort Worth 1994, writ denied); *W. Loop Hosp., LLC v. Hou.*

*Galleria Lodging Assocs., LLC*, 649 S.W.3d 461, 482 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) ("A third-party beneficiary 'steps into the shoes' of the contracting parties and is subject to and bound by all provisions of the contract.").

A contractual promise—like one to waive consequential damages "connected in any way" to the Master Agreement, whether as to a signatory or as to a signatory's "subcontractor," ROA.8056—"creates a duty in the promisor to any intended beneficiary to perform the promise." *In re Citgo Petrol. Corp.*, 248 S.W.3d 769, 775 (Tex. App.—Beaumont 2008, no pet.) (quoting Restatement (Second) of Contracts § 304 (1981)). The "intended beneficiary may [then] enforce the duty"—full stop. *Id.*

Alta's reliance (at 30–31) on *Finley Resources Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332 (Tex. 2023), is misplaced. *Finley* concerned the ambiguity of the term "predecessor" in a deed's release clause. *Id.* at 336–45. The Texas Supreme Court turned to context in resolving the ambiguity by holding that the term referred only to corporate predecessors, not predecessors-in-interest to the property, because the contract's grammar and structure revealed that the release was tied to corporate relationships. *Id.* at 343–45. In contrast, there's no ambiguity

36

here—as Alta itself recognized in moving for summary judgment under the consequential-damages waiver. ROA.20480–20514.

Alta doubles down on its effort to rewrite the agreement by seeking to impose yet another atextual limitation on the waiver's plain language. It argues (at 28–29, 32–33) that, in addition to an "implicit" capacity limitation, there's also an unwritten temporal limitation that GE violated by seeking to invoke the waiver for conduct predating the Master Agreement. According to Alta, enforcing the waiver would transform it into a release of liability. But Section 9.1(B) doesn't release claims at all. It merely limits the scope of recoverable damages—"consequential damages," including "loss of profit"—for claims "connected in any way" to the Master Agreement. ROA.8056.

Alta's position (at 28–29) that the term "subcontractor" itself bakes in a temporal limitation is also misplaced. Neither of the cases (nor the dictionary definitions) Alta cites supports that proposition. *See Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 778 (5th Cir. 2006) (defining subcontractor); *Bayou Steel Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 642 F.3d 506, 511 (5th Cir. 2011) (same). As Alta itself recognizes (at 21), context matters. So does plain text. And

the Master Agreement waives consequential damages "connected in any way" to the agreement with no temporal limitation.  ROA.8056.

Even taken on its own terms, Alta's temporal theory goes nowhere. That's because the record conclusively establishes that GE's relationship with WattStock long predated the Master Agreement.  The two signed their MOU in 2017—nearly two years before Alta and WattStock finalized the Master Agreement.  *Compare* ROA.7875 (executing the MOU on June 26, 2017), *with* ROA.8049 (Master Agreement "made and entered into as of the 27th day of February 2019").  The MOU established that GE could serve as a subcontractor to WattStock on Alta's project. *See* ROA.7871, 8056.  So the record conclusively rebuts Alta's assertion that the alleged conduct occurred before GE became a subcontractor.

What's more, not only did Alta reaffirm the consequential-damages waiver in February 2020 in its amended Master Agreement with WattStock, but it also went a step further in April 2020 and executed a separate NDA with GE related to GE's work as WattStock's subcontractor.  ROA.21075–76 (Master Agreement, including waiver provision, remained "in full force and effect"); ROA.23701–04 (2020 NDA).

38

By that point, as the record conclusively establishes, GE and WattStock had a written contractual relationship for Alta's project specifically—which began in mid-2019, months ***before*** Alta twice reaffirmed the waiver. ROA.8080–81 (acknowledging in 2019 that "[i]mportant components" of WattStock's work "will be subcontracted to GE"); *see also* ROA.21087, 21138 (acknowledging in 2019 that GE was a "Major Subcontractor" for WattStock). So Alta's temporal theory is refuted by both the plain language of the Master Agreement and the uncontroverted record evidence.

**2.** Alta falls back (at 34–40) on an argument that its fraud allegations categorically override the consequential-damages waiver. But that argument is foreclosed by the Texas Supreme Court's decision in *Bombardier*.

There, the plaintiffs bought what they thought was a new private jet from Bombardier. *Bombardier*, 572 S.W.3d at 217. The purchase agreements among the parties included limitation-of-liability clauses that expressly barred punitive damages. *Id.* at 217–18. The plaintiffs sued Bombardier for fraud after discovering that the plane was not, in fact, new. *Id.* at 219. A jury awarded the plaintiffs over $2.5 million in

actual damages and nearly $5.5 million in punitive damages.  *Id.*
Bombardier appealed, arguing that the agreements barred the jury's
punitive damages award.  *Id.*  The court of appeals held that the alleged
fraud vitiated the limitation-of-liability clauses.  *See id.*

The Texas Supreme Court reversed.  *Bombardier*, 572 S.W.3d at
234.  It noted that the contracting parties were "sophisticated entities
represented by attorneys in an arms-length transaction" that "bargained
for the limitation-of-liability clauses."  *Id.* at 232.  It emphasized that
"[l]imitation-of-liability clauses" are "generally valid and enforceable,"
and that courts must "respect and enforce terms of a contract that parties
have freely and voluntarily entered."  *Id.* at 231–32.  And it underscored
that it had "never held . . . that fraud vitiates a limitation-of-liability
clause."  *Id.* at 232.[8]

In *Bombardier*'s wake, courts in Texas routinely have enforced
damages-limitation clauses—including consequential-damages waivers

---

[8]    The cases on which Alta relies (at 23, 34–35) for the *general*
proposition that fraud vitiates whatever it touches are therefore beside
the point.  *See City of Fort Worth v. Rylie*, 602 S.W.3d 459 (Tex. 2020);
*Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52 (Tex. 2015); *Dall.
Farm Mach. Co. v. Reaves*, 307 S.W.2d 233 (Tex. 1957); *Morris v. House*,
32 Tex. 492 (1870); *United States v. Throckmorton*, 98 U.S. 61 (1878);
*Wintz v. Morrison*, 17 Tex. 372 (1856).

like the one at issue here—over allegations of fraud. *E.g.*, *BigCommerce, Inc. v. Cover Genius Warranty Servs., LLC*, 2025 WL 1270110, at \*10 (W.D. Tex. Feb. 27, 2025) (enforcing consequential-damages waiver despite plaintiff's allegations of fraud); *Pizza Hut, LLC v. Ronak Foods, LLC*, 2022 WL 20564482, at \*12 (E.D. Tex. Feb. 10, 2022) (same and emphasizing that "*Bombardier* dictates that even . . . allegations of fraud cannot negate" a consequential-damages waiver); *Great Hans, LLC v. Liberty Bankers Life Ins. Co.*, 2019 WL 1219110, at \*9 (Tex. App.—Dallas Mar. 15, 2019, no pet.) (enforcing a "stipulated damage provision" that limited actual damages despite plaintiff's claim that "the contract was procured by fraud"). This Court should decline Alta's invitation to stray from the pack.[9]

Alta's efforts to distinguish *Bombardier* are futile. Alta insists (at 38–39) that *Bombardier* rests on the fact that the plaintiffs had previously tried to enforce the contract they later sought to avoid. But

---

[9] As the district court correctly recognized, Texas courts applying *Bombardier* have emphasized the importance of respecting the terms of contracts freely made and voluntarily entered. ROA.23865–66. Alta's critique of the district court (at 38 n.7) for highlighting this principle goes nowhere—particularly given that the case Alta cites *declined* to override a contract based on public policy. *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016).

nowhere in *Bombardier* did the Texas Supreme Court suggest that its holding applies only in these circumstances. At any rate, Alta ***did*** previously try to enforce the Master Agreement against both WattStock and GE, ROA.9179–84, 9199, 9208—so *Bombardier* would still apply here even on Alta's misreading of the case.[10]

Nor does it matter that in *Bombardier* both parties were signatories to the contract. *See* Alta Br. 39. Nothing in *Bombardier* suggests that it applies only to signatories as opposed to third-party beneficiaries, and Alta cites nothing to support that proposition. Alta's efforts (at 37–39) to cabin *Bombardier* to punitive damages are equally misplaced, because the agreements in *Bombardier* expressly waived "consequential damages" just like the agreements here. *See* 572 S.W.3d at 217–18.

As *Bombardier* emphasizes, Texas has long recognized the "strongly embedded public policy favoring freedom of contract." 572 S.W.3d at 230. As a result, limitation-of-liability clauses are enforceable under Texas law "[a]bsent a compelling reason." *Great Hans*, 2019 WL

---

[10] Alta relies (at 38–39) on *In re Weekly Homes, L.P.*, 180 S.W.3d 127, 135 (Tex. 2005), and *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 755 (Tex. 2001), but those cases—which predate *Bombardier*—simply stand for the uncontested proposition that a party can't have its contract and defeat it too.

1219110, at *9.[11]  As the district court correctly recognized, the Texas Supreme Court "made clear" in *Bombardier* "that waving the fraud flag does not constitute a compelling reason."  ROA.23866.

3.  Alta argues (at 41–45) that the consequential-damages waiver extends only to "unintentional" torts.  This argument too leads nowhere.  Alta's first mistake (at 41–42) is leaning more heavily on interpretive canons than on the text.  The text always comes first.  *TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 181 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).  And the text is clear:  Alta is barred from making "any claim for any incidental, indirect or consequential damages"—including "loss of profit"—"arising out of or connected in any way" to the Master Agreement.  ROA.8056.

The contract's plain language is categorical—the parties waived "***any*** claim" for "***any*** . . . consequential damages" "connected in ***any*** way"

[11]  Alta's focus (at 23–25) on cases about disclaimers of reliance and releases is therefore misplaced.  *See Transcor Astra Group S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462 (Tex. 2022); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323 (Tex. 2011); *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex. 2008); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997); *Victoria Bank & Tr. Co. v. Brady*, 811 S.W.2d 931 (Tex. 1991); *see also Vitol, Inc. v. United States*, 30 F.4th 248 (5th Cir. 2022).

to the Master Agreement. ROA.8056 (emphases added). Nothing limits the waiver by the ***type*** of claim. "Read naturally," the word "any" has an "expansive meaning"—"'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting *Webster's Third New International Dictionary* 97 (1976)).

Alta's next mistake (at 41–42) is misapplying the interpretive canons it relies upon—particularly *expressio unius*. That canon applies when a text lists several items within a "commonly associated group or series," implying the exclusion of others. *United States v. Vonn*, 535 U.S. 55, 65 (2002). But as the Supreme Court "repeatedly" has cautioned, *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003), the canon's "fallibility can be shown by contrary indications" in the text itself. *Vonn*, 535 U.S. at 65. Alta's own cases confirm the same. *See City of Austin v. Powell*, 704 S.W.3d 437, 453–55 (Tex. 2024) (declining to apply *expressio unius*); *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 429 (Tex. 2017) (same).

Alta simply ignores the "contrary indications" in Section 9.1(B)— most important, the opening sentence, which expansively bars "any claim" for consequential damages, and the first half of the second

sentence, which provides that the waiver applies to "any cause of action." ROA.8056. Those contrary indications were absent in Alta's inapposite case. *See First Nat'l Bank of Luling v. Nugent*, 384 S.W.2d 224, 226 (Tex. App.—San Antonio 1964, writ ref'd n.r.e).

Alta also misreads the word "including" in the final clause of Section 9.1(B) as introducing an exclusive list. ROA.8056. Both the Texas Supreme Court and this Court have rightly refused to invoke *expressio unius* to narrow a clause introduced by the word "including." *See*, *e.g.*, *In re E.C.R.*, 402 S.W.3d 239, 246 n.6 (Tex. 2013); *Hometown 2006–1 1925 Valley View, L.L.C. v. Prime Income Asset Mgmt., L.L.C.*, 595 F. App'x 306, 311 (5th Cir. 2014) ("It is hornbook law that the use of the word *including* indicates that the specified list . . . is illustrative, not exclusive.") (alteration in original) (quoting *Tex. Prop. & Cas. Ins. Guar. Ass'n v. Sw. Aggregates, Inc.*, 982 S.W.2d 600, 608 (Tex. App.—Austin 1998, no pet.)); Tex. Gov't Code § 311.005(13).

Take, for example, *St. Paul Mercury Insurance Co. v. Lexington Insurance Co.*, 78 F.3d 202 (5th Cir. 1996). There, this Court examined the term "including" in an insurance policy. *Id.* at 206. That policy incorporated an "escape clause" from a different policy that avoided

liability in the event of other insurance. *Id.* The policy provided that it would follow the "terms and conditions" of the different policy's escape clause, "***including*** named assureds, special additional assureds, loss payees, and waivers of subrogation." *Id.* at 206 (emphasis added). This Court held that *expressio unius* didn't apply to narrow the list that followed "including" because that word is "generally given an ***expansive*** reading." *Id.* at 206–07 (emphasis in original).

So too here. The list in Section 9.1(B) is prefaced by the word "including," and that word expands the challenged list—it doesn't limit it. ROA.8056.

Neither of Alta's cases supports its reading of the Master Agreement. In one, the court concluded that "pre-injury waivers of future liability" were "unenforceable on grounds of public policy." *Zachry Const. Corp. v. Port of Hou. Auth.*, 449 S.W.3d 98, 116 (Tex. 2014). That's not the case with the consequential-damages waiver here. In the other, the term "including" appeared nowhere in the statutory provision at issue. *Waak v. Rodriguez*, 603 S.W.3d 103, 106–12 (Tex. 2020). The court held only that the term "participant," defined as "a person who engages in [a farm animal] activity," had to be construed consistent with the examples

listed in the definition.  *Id.* at 109.  The court nowhere held, as Alta contends, that the word "including" should be construed narrowly even when it follows expansive language like "any claim" and "any cause of action."

Alta's "[o]ther textual clues" (at 42–45) fare no better.  It contends (at 42–43) that the word "including" is narrower than the phrase "shall include, but is not limited to," which appears earlier in the text. ROA.8056.  That argument defies ordinary English usage and ignores that "drafters often include redundant language to illustrate or emphasize their intent." *Ohio Cas. Ins. Co. v. Patterson-UTI Energy, Inc.*, 703 S.W.3d 790, 796 (Tex. 2024).  Alta's reliance on the canon of consistent usage, *see* Alta Br. 43–45 (citing *Great Lakes Ins., S.E. v. Gray Grp. Invs., L.L.C.*, 76 F.4th 341, 347 (5th Cir. 2023), and *Malouf v. State ex rel. Ellis*, 694 S.W.3d 712, 727 (Tex. 2024)), is misplaced given that "shall include, but is not limited to" is a belt-and-suspenders phrase that means the same thing as "including."

The "commonness of these belts-and-suspenders phrases"—like "*including but not limited to*"—"does not lessen the exemplariness of *include*."  Bryan A. Garner & Antonin Scalia, *Reading Law* 132–33

(2012).  Used together, these synonyms reinforce—rather than restrict—Section 9.1(B)'s breadth.  Even if the list of causes of action at the end of Section 9.1(B) were exclusive, as Alta argues (at 44–45), the beginning of that sentence makes clear that the "***mutual waiver*** of consequential damages shall include, but ***is not limited to***," those claims.  ROA.8056 (emphases added).

Alta invites the Court (at 43–44) to limit Section 9.1(B) by comparing it to Section 9.1(A), which caps "any and all liability . . . however alleged or arising" at $100,000.  ROA.8056.  Alta insists that Section 9.1(A) shows that the parties knew how to draft comprehensively, but chose not to in Section 9.1(B).  That argument cannot be squared with itself.  To adopt Alta's reading, the Court would have to add text to the contract that simply isn't there.

Alta's comparison of Section 9.1(A) and Section 9.1(B) misses the point in all events.  Even if Section 9.1(B) were narrower than Section 9.1(A), Section 9.1(B)'s scope is still defined by "connect[ion]" to the Master Agreement—not by cause of action.  By Alta's own account, GE's alleged fraudulent misrepresentations induced execution of the Master Agreement.  The connection is indisputable.

＊　＊　＊

Plain text resolves this case. Section 9.1(B) bars "any claim" for "consequential damages"—including "loss of profit"—"connected in any way" to the Master Agreement. ROA.8056. That language admits of no exceptions, as the district court correctly recognized. Alta's attempts to avoid the waiver it bargained for must be rejected.[12]

## II. GE is entitled to summary judgment on additional, independent grounds.

The district court had no need to reach GE's other arguments for summary judgment. This Court, of course, "may affirm a summary judgment on any ground supported by the record, even if it is different from that relied on by the district court." *Sheet Pile*, 98 F.4th at 165. Two additional, independent grounds further support affirmance here.

---

[12] Alta's resolute avoidance of plain text recalls Whit Stillman's classic film *Barcelona*:

*Fred*: So subtext we know. But what do you call the message or meaning that's right there on the surface, completely open and obvious? They never talk about that. What do you call what's above the subtext?

*Ted*: The text.

*Fred*: OK, that's right, but they never talk about that.

**A.** **Alta's lost-profit damages are too speculative to be recoverable as a matter of Texas law.**

Alta is barred as a matter of law from recovering the over $400 million it seeks in allegedly lost profits because those lost profits are impermissibly speculative. Under Texas law, parties can recover lost profits only if they prove "the fact and amount of damages with reasonable certainty." *Am. Midstream*, 714 S.W.3d at 583 (citing *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 860 (Tex. 2017)). Alta can't come close to satisfying that rigorous standard. Its attempt to transmogrify a failed, risky business venture into a nine-figure windfall must be rejected.

The Texas Supreme Court's decision in *American Midstream* confirms that conclusion. There, a gas-trading company—Rainbow Energy—planned to exercise its contractual right to run an "imbalance" in one of its pipelines to fulfill forward sales contracts. 714 S.W.3d at 574–76. Similar to Alta's untested peaker-plant project, this was a new venture for Rainbow. *Id.* The other party to the contract, American Midstream, allegedly interfered with Rainbow's plan. *Id.* at 577. Rainbow sued, asserting fraud, fraudulent-inducement, and negligent misrepresentation. *Id.* Like Alta, Rainbow sought lost profits for alleged

fraud. *Id.* The Texas Supreme Court identified two glaring flaws in Rainbow's lost-profits model.

*First*, Rainbow's plan to fulfill forward sales contracts by exercising certain contractual rights was an "untested venture"—something Rainbow had never done before. 714 S.W.3d at 584. Texas law has long prohibited parties from recovering lost-profit damages on "new and unproven" enterprises. *Id.* (quoting *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994)).

*Second*, Rainbow's plan was a "chancy business opportunit[y]" for which Texas law forbids lost-profits recovery. 714 S.W.3d at 584 (alteration in original) (quoting *Tex. Instruments*, 877 S.W.2d at 279). The court highlighted that "changing market conditions"—i.e., the "price of gas on the daily market" fluctuated significantly—made Rainbow's lost-profit model "too speculative" to support recovery of lost-profit damages. *Id.*

*American Midstream* is on all fours with this case. Alta's peaker-plant project was an "untested venture" that never progressed beyond the financing stage. 714 S.W.3d at 584; ROA.7589–91, 7743–44. And Alta's business plan sought to take advantage of the fact that the "price of

51

[energy] on the daily market" fluctuated significantly and peaked in times when demand exceeded capacity. *Am. Midstream*, 714 S.W.3d at 584.

Alta's operations would've been untested even if it could have secured financing—which it never did. From the start, Alta depended almost entirely on third-party lenders to fund its peaker-plant venture. *See* ROA.7737–38. Every lender that evaluated the project—88 in total—ultimately refused to invest. ROA.9092–93, 7675. And the two lenders that came closest to investing decided against it for reasons entirely unrelated to GE or WattStock—undercapitalization; the risk of litigation with a competitor; and market uncertainty caused by COVID-19. ROA.7737–38, 8756–59, 8776–78, 8955–57. Without financing, Alta couldn't purchase turbines, construct a facility, or begin operations—all essential prerequisites to earning any profit.

Alta's lost-profit model just assumes all of that away. It rests on a cascade of improbable assumptions:

(1)  securing financing;

(2)  constructing a peaker plant;

(3)  starting to operate the peaker plant before Winter Storm Uri hit in February 2021; and

(4)  operating its plant continuously during Winter Storm Uri, even while most other gas-fired plants went offline.

ROA.7589–91. Alta's lost-profits theory depends on speculation piled upon speculation—about financing it never secured, a plant it never built, and profits it never earned.

Texas law doesn't permit recovery on such conjecture. *Horizon Health*, 520 S.W.3d at 860 (affirming take-nothing judgment on lost profits and explaining that Texas law "is wisely skeptical of claims of lost profits from untested ventures or in unpredictable circumstances, which in reality are little more than wishful thinking"); *Tex. Instruments*, 877 S.W.2d at 279 (same and noting that "[f]actors . . . which make a business venture risky in prospect preclude recovery of lost profits in retrospect"). As a matter of law, Alta can't recover lost profits for a project that was never financed, built, or operated—and based on market conditions that were highly unstable to boot.

## B. Alta's recovery of lost profits is barred by the statute of frauds.

The statute of frauds independently bars Alta's attempt to recover lost profits. Texas law prohibits parties from enforcing—or recovering damages based on—oral promises that fall within the statute of frauds. Tex. Bus. & Com. Code § 26.01; *Nagle v. Nagle*, 633 S.W.2d 796, 800 (Tex. 1982).

Alta's entire case rests on two alleged oral promises: (1) to deliver nine TruePackage units for $10 million or less, and (2) to assume WattStock's outstanding contractual obligations if WattStock defaulted. ROA.7660–61. Under the statute of frauds, promises that involve the sale of goods for more than $500 or answering for the debt of another must be reduced to writing for a party to enforce them. Tex. Bus. & Com. Code §§ 2.201(a), 26.01(b)(2).

It's undisputed that neither purported promise was reduced to writing. It's also undisputed that Alta reduced its *other* promises with GE to writing—as it did in the 2020 NDA, which expressly provided that "[u]nless based upon another agreement in writing signed by the Parties, neither Party will rely upon any representation or expectation that the other Party will enter into any relationship or transaction." ROA.23703. As a result, both purported oral promises fall within the statute of frauds. *See Wood v. Wiggins*, 650 S.W.3d 533, 550–54 (Tex. App.—Houston [1st Dist.] 2021, pet. denied).

Alta's repackaging of breach-of-contract claims as fraud claims changes nothing. *See Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001). Where, as here, the statute of frauds bars enforcement of an oral contract,

it similarly bars fraud claims seeking "damages for lost profits." *Ghosh v. Grover*, 412 S.W.3d 749, 757 (Tex. App.—Houston [14th Dist.] 2013, no pet.). So Alta's claimed lost profits are unrecoverable as a matter of law under the statute of frauds.

This conclusion comports with decades of Texas Supreme Court precedent. That court always "focus[es] the legal treatment of claims on the true nature of disputes rather than allow[ing] artful pleading to morph contract claims into fraud causes of action to gain favorable redress under the law." *Sonnichsen*, 221 S.W.3d at 636 (affirming summary judgment). That principle applies with special force in the statute-of-frauds context, which exists to "prevent fraud and perjury" by requiring certain agreements to be written. *Haase*, 62 S.W.3d at 799 (affirming summary judgment). That purpose would be "frustrated" and the statute "easily circumvented" if parties could "use a fraud claim essentially to enforce a contract the [s]tatute makes unenforceable." *Id.*

At bottom, Alta's claims rest on alleged oral promises that fall squarely within the statute of frauds and seek precisely the type of damages that Texas law bars. Alta's fraud theory is merely an artful attempt to enforce oral promises the law doesn't recognize.

*    *    *

Alta—a sophisticated party represented by counsel in an arms-length transaction—freely bargained for the mutual waiver of consequential damages it now seeks to avoid.  The plain text of that waiver begins and ends the inquiry, as the district court correctly held, because it expressly prohibits Alta from recovering lost profits as a matter of law.  Even if Alta could get past the waiver, it still couldn't recover speculative lost profits based on alleged oral promises under long-settled principles of Texas law.  Summary judgment should be affirmed.

## CONCLUSION

The Court should affirm the judgment of the district court.

Dated: January 14, 2026

Respectfully submitted,

/s/ *Allyson N. Ho*
Allyson N. Ho
John T. Cox
Bradley G. Hubbard
Andrew P. LeGrand
Bryston C. Gallegos
Arjun Ogale
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2900
*aho@gibsondunn.com*
*tcox@gibsondunn.com*
*bhubbard@gibsondunn.com*
*alegrand@gibsondunn.com*
*bgallegos@gibsondunn.com*
*aogale@gibsondunn.com*

COUNSEL FOR APPELLEE
GENERAL ELECTRIC INTERNATIONAL, INCORPORATED

**CERTIFICATE OF SERVICE**

I certify that, on January 14, 2026, a true and correct copy of the foregoing brief was served via CM/ECF on all counsel of record.

/s/ *Allyson N. Ho*
Allyson N. Ho

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it was prepared in 14-point New Century Schoolbook, a proportionally spaced typeface, using Microsoft Word for Microsoft 365. This brief complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 10,058 words, excluding the parts exempted by Rule 32(f).

I certify that: (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission of this document is an exact copy of any corresponding paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus-scanning program and is free of viruses.

/s/ *Allyson N. Ho*
Allyson N. Ho