IN THE

# United States Court of Appeals for the Fifth Circuit

ALTA POWER, LLC,

*Plaintiff–Appellant*,

*v.*

GENERAL ELECTRIC INTERNATIONAL, INCORPORATED,

*Defendant–Appellee*.

On Appeal from the U.S. District Court for the Northern District of Texas, Dallas Division, No. 3:23-CV-0270-X

## REPLY BRIEF OF APPELLANT ALTA POWER, LLC

John B. Lawrence
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
john.lawrence@bakerbotts.com

Michael Cancienne
Joseph W. Golinkin II
JORDAN, LYNCH & CANCIENNE PLLC
1980 Post Oak Boulevard
Houston, Texas 77056
(713) 220-4019
mcancienne@jlcfirm.com
jgolinkin@jlcfirm.com

Aaron M. Streett
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com
beau.carter@bakerbotts.com

*Counsel for Alta Power, LLC*

**Page**

Table of Contents .............................................................................................i

Table of Authorities ........................................................................................ ii

Introduction .....................................................................................................1

Argument..........................................................................................................2

I.     The Alta–WattStock Agreement did not retroactively waive consequential damages for third-party GE's pre-Agreement, non-subcontractor conduct.............................................................................2

II.    The Alta–WattStock Agreement's fraudulently induced consequential-damages waiver is not enforceable under Texas law, especially not by third-party GE. ...................................................................................15

III.   The Alta–WattStock Agreement does not limit consequential damages for GE's intentional torts. ..................................................................21

IV.   The Court should decline to address—or reject—GE's alternative grounds for affirmance. .........................................................................25

Conclusion .....................................................................................................29

Certificate of Compliance ..............................................................................30

Certificate of Service .....................................................................................30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Adair*,
  137 F.4th 384 (5th Cir. 2025) ..................................................................................25

*Am. Midstream (Ala. Intrastate), LLC v. Rainbow Energy Mktg. Corp.*,
  714 S.W.3d 572 (Tex. 2025) ...............................................................................26, 27

*Biden v. Nebraska*,
  600 U.S. 477 (2023)...................................................................................................6

*BigCommerce, Inc. v. Cover Genius Warranty Servs., LLC*,
  1:23-CV-298-DAE, 2025 WL 1270110 (W.D. Tex. Feb. 27, 2025) ...........20, 21

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*,
  572 S.W.3d 213 (Tex. 2019) ...................................... 2, 15, 16, 17, 18, 19, 20, 21

*City of Austin v. Powell*,
  704 S.W.3d 437 (Tex. 2024) ...................................................................................22

*In re Dallas County*,
  697 S.W.3d 142 (Tex. 2024) .....................................................................................5

*Dynegy, Inc. v. Yates*,
  422 S.W.3d 638 (Tex. 2013) ...................................................................................27

*Finley Res. Inc. v. Headington Royalty, Inc.*,
  672 S.W.3d 332 (Tex. 2023) .............................................................................7, 8, 9

*First Bank v. Brumitt*,
  519 S.W.3d 95 (Tex. 2017).................................................................................15, 16

*First Nat'l Bank of Luling v. Nugent*,
  384 S.W.2d 224 (Tex. App.—San Antonio 1964, writ ref'd n.r.e.)...................22

*Forest Oil Corp. v. El Rucio Land & Cattle Co.*,
  518 S.W.3d 422 (Tex. 2017) ...................................................................................22

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*,
   960 S.W.2d 41 (Tex. 1998)...................................................................28

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
   99 F.4th 770 (5th Cir. 2024) ................................................................13

*Great Hans, LLC v. Liberty Bankers Life Ins. Co.*,
   No. 05-17-01144-CV, 2019 WL 1219110 (Tex. App.—Dallas Mar.
   15, 2019, no pet.) ............................................................................20, 21

*Great Lakes Ins., S.E. v. Gray Grp. Invs., L.L.C.*,
   76 F.4th 341 (5th Cir. 2023) ................................................................23

*Hux v. S. Methodist Univ.*,
   819 F.3d 776 (5th Cir. 2016) ................................................................21

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
   341 S.W.3d 323 (Tex. 2011) ....................................................9, 16, 17

*Lone Star Nat'l Bank, N.A. v. Heartland Payment Sys., Inc.*,
   729 F.3d 421 (5th Cir. 2013) ................................................................26

*Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*,
   26 F.3d 531 (5th Cir. 1994) ..............................................................3, 15

*Morath v. Lampasas Indep. Sch. Dist.*,
   686 S.W.3d 725 (Tex. 2024) ..................................................................6

*N.Y. Tr. Co. v. Comm'r*,
   68 F.2d 19 (2d Cir. 1933) ......................................................................5

*Phillips v. Carlton Energy Grp., LLC*,
   475 S.W.3d 265 (Tex. 2015) ................................................................26

*Pizza Hut, LLC v. Ronak Foods, LLC*,
   No. 5:21-CV-00089-RWS, 2022 WL 20564482 (E.D. Tex. Feb.
   10, 2022) ........................................................................................20, 21

*Point Energy Partners Permian, LLC v. MRC Permian Co.*,
   669 S.W.3d 796 (Tex. 2023) ..................................................................6

*Preston Hollow Cap., LLC v. Truist Bank*,
No. 25-BC01B-0030, 2025 WL 3716371 (Tex. Bus. Ct.—Dallas
Dec. 19, 2025)...................................................................................................19

*Reed v. Taylor*,
923 F.3d 411 (5th Cir. 2019) ........................................................................2, 6

*Talman Home Fed. Sav. & Loan Ass'n of Ill. v. Am. Bankers Ins.*,
924 F.2d 1347 (5th Cir. 1991) ...........................................................................3

*Tex. Instruments v. Teletron Energy Mgmt.*,
877 S.W.2d 276 (Tex. 1994) ............................................................................26

*Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*,
650 S.W.3d 462 (Tex. 2022) ..........................................................................8, 9

*Utah Junk Co. v. Porter*,
328 U.S. 39 (1946).............................................................................................5

*Waak v. Rodriguez*,
603 S.W.3d 103 (Tex. 2020) ............................................................................24

*Wal-Mart Stores, Inc. v. Xerox State & Local Sols., Inc.*,
663 S.W.3d 569 (Tex. 2023) .............................................................................3

*Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*,
920 F.3d 958 (5th Cir. 2019) ..........................................................................25

*Wintz v. Morrison*,
17 Tex. 372 (1856)...........................................................................................16

*Zachry Constr. Corp. v. Port of Hous. Auth. of Harris Cnty.*,
449 S.W.3d 98 (Tex. 2014)...............................................................18, 22, 23

*Zaragoza v. Union Pac. R.R. Co.*,
112 F.4th 313 (5th Cir. 2024). ........................................................................25

## Other Authorities

Scalia & Garner, READING LAW:
THE INTERPRETATION OF LEGAL TEXTS (2012).................................................5, 6

GE's fraud induced Alta to enter the Master Agreement with WattStock. The Agreement waives consequential damages between Alta, WattStock, and both parties' respective "subcontractors." GE later became WattStock's subcontractor. Did this clause immunize GE's pre-Agreement, fraudulent conduct *before* it became WattStock's subcontractor? Of course not. A "subcontractor" is not a metaphysical status that attaches to a company for all purposes, forever. It describes a role—work performed for a contracting party, under a contract. That definition carries two unavoidable limits: The entity must be a subcontractor *at the time of the conduct*, and it must be acting *as a subcontractor* when it engages in the supposedly immunized act. GE flunks both prongs, so it cannot claim the waiver's safe harbor.

GE knows this, so it reverts to chanting "plain text" and hoping repetition substitutes for meaning. But the Supreme Court of Texas has rejected that approach: Context supplies a contract's *fair* (not hyper-literal) meaning. And in context, this Agreement does what commercial consequential-damages waivers normally do: allocate performance risk among contracting parties and their subcontractors acting in that capacity. It does not immunize pre-contract fraud by entities who later join the project. That alone warrants reversal.

The district court also became the first court to allow a third-party beneficiary to enforce a fraudulently induced consequential-damages waiver. That outcome

1

offends multiple principles of Texas law, including those embodied in *Bombardier*, the very case the district court purported to apply. Finally, the district court failed to appreciate Texas law's differential treatment between waivers of intentional and unintentional torts, causing another context-free reading of the Agreement.

Perhaps recognizing all this, GE seeks affirmance on alternative grounds. The Court should decline. In this highly complex and fact-bound dispute, the district court is best situated to consider those issues on remand. The Court should reverse.

**ARGUMENT**

**I. The Alta–WattStock Agreement did not retroactively waive consequential damages for third-party GE's pre-Agreement, non-subcontractor conduct.**

The Alta–WattStock Agreement waives consequential damages for contractual parties and those acting as "subcontractors" under the Agreement. That reading flows naturally from the ordinary meaning of "subcontractors" as that term is used in the Agreement. GE asks this Court to interpret the term "subcontractor" divorced from context and background principles of Texas law. But "judges, like all readers, must be attentive not to words standing alone but to surrounding structure and other contextual cues that illuminate meaning." *Reed v. Taylor*, 923 F.3d 411, 415 (5th Cir. 2019). The text, context, and common sense compel reversal.

**A.** Resetting the scene, Alta and WattStock entered into the Master Agreement in February 2019. ROA.21263. WattStock would locate and secure

2

turbines for Alta's peaker plants, and the two would enter future agreements involving the purchase and installation of those turbines. ROA.21265-66. In initiating this business relationship, Alta agreed that WattStock would not be liable for consequential damages "arising out of or connected in any way to [the] Agreement," nor would any of WattStock's "officers, directors, partners, employees, representatives, contractors or subcontractors." ROA.21270. The question here is whether this language retroactively absolves GE for committing fraud that (1) predated the Agreement and (2) fell outside GE's capacity as a subcontractor.

The answer is no. Alta and WattStock clearly intended to waive consequential damages only for each other and for certain classes of third parties. And "clearly intended" is no rhetorical flourish. To invoke the Agreement's safe harbor as a third-party beneficiary, GE must establish that the Agreement is "sufficiently clear and unequivocal" in waiving consequential damages for its pre-Agreement, non-subcontractor conduct. *See Wal-Mart Stores, Inc. v. Xerox State & Local Sols., Inc.*, 663 S.W.3d 569, 583 (Tex. 2023). That is a "heavy burden," *Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531, 540 (5th Cir. 1994), and "any doubt concerning the intent" to secure that benefit to GE "should be construed against such intent," *Talman Home Fed. Sav. & Loan Ass'n of Ill. v. Am. Bankers Ins.*, 924 F.2d 1347, 1351 (5th Cir. 1991) (citation omitted). Indeed, GE (at 29 n.5) concedes its burden is a "heavy" one.

3

By limiting the third parties by class, Alta and WattStock necessarily intended to benefit those individuals in their *capacities* as members of the relevant class. Alta Br. 28-29. The ordinary meaning of those classes—"officers, directors, partners, employees, representatives, contractors or subcontractors"—denotes relational roles, and thus naturally carry capacity and timing limitations. A "subcontractor" relationship definitionally arises only after a "contractor" relationship is established—here, between Alta and WattStock. *Id*. When GE defrauded Alta before the Agreement, GE was not yet WattStock's subcontractor, and it was not acting as WattStock's subcontractor. ROA.21068-69. GE does not claim otherwise. *See* GE Br. 39 (recognizing that GE and WattStock did not have a "written contractual relationship for Alta's project" until "mid-2019"). That is fatal and warrants reversal of summary judgment.

**B.** By GE's telling, the Alta–WattStock Agreement "bars 'any claim' for 'any . . . consequential damages' 'connected in any way to' the [A]greement," and "[t]hat waiver applies to not only Alta and WattStock, but also their 'contractors or ***subcontractors***.'" GE Br. 25 (quoting § 9.1(B), ROA.8056 (emphasis GE's)). Under this formulation, when Alta and WattStock initiated their business relationship in the Agreement, Alta meant to absolve *any* non-party's *pre-Agreement* conduct so long as that non-party *later* became one of WattStock's "officers, directors, partners, employees, representatives, contractors or subcontractors." The

"only" "limitation," says GE (at 34), is that "the claim must be 'connected' to the Master Agreement" in some way. The district court adopted this "sweeping" formulation of the Agreement. ROA.23859.[1]

This interpretation suffers from a terminal hyperliteralism. "Words must be read in light of their historical and linguistic context," and courts "must tether" their interpretations "to the *fair meaning* of the text, not the hyperliteral meaning of each word in the text." *In re Dallas County*, 697 S.W.3d 142, 157-58 (Tex. 2024) (quoting Scalia & Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 356 (2012) ("READING LAW")). Because "literalness may strangle meaning," *Utah Junk Co. v. Porter*, 328 U.S. 39, 44 (1946), courts must avoid "a sterile literalism which loses sight of the forest for the trees," *N.Y. Tr. Co. v. Comm'r*, 68 F.2d 19, 20 (2d Cir. 1933) (L. Hand, J.).

GE myopically focuses on one term and one phrase: "subcontractor" and "connected in any way." Its syllogism proceeds as follows: (a) GE is a "subcontractor" because it ultimately became one; (b) GE's pre-Agreement, non-subcontractor fraud was connected to the Agreement; ergo (c) GE's conduct is covered by the Agreement. But that rigid formula flouts the plain meaning of the term "subcontractor" in the context of the Agreement. Alta and WattStock were not

---

[1] The district court accepted GE's interpretation after both the state and bankruptcy courts had rejected it. Alta Br. 3, 33.

executing a release of preexisting claims, nor were they disclaiming reliance on past representations. Alta Br. 23-25, 32-33. The Agreement initiated a business relationship, and in doing so, set the rules for recovery in the event of a fallout. *Id.* at 22-23. In this context, a liability limitation for "subcontractors" naturally applies to those acting as subcontractors, not those who become subcontractors after committing fraud predating the contract. GE's "[r]obotic literal parsing" of those terms "cloak[s] rather than clarif[ies]" the Agreement's meaning. *Reed*, 923 F.3d at 415.

GE concedes that "context matters," but demotes it to an "interpretive principle" that has "no license to override plain text." GE Br. 30 n.6, 37-38. But the choice between text and context is not binary. Indeed, "context is as important as sentence-level text." *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 808 n.38 (Tex. 2023) (quoting READING LAW at 323). "Context also includes common sense." *Morath v. Lampasas Indep. Sch. Dist.*, 686 S.W.3d 725, 738 (Tex. 2024) (quoting *Biden v. Nebraska*, 600 U.S. 477, 512 (2023) (Barrett, J., concurring)). And here, in context, Alta and WattStock did not intend (much less *clearly* intend) to retroactively waive consequential damages for third-party "subcontractors" for actions taken before they could have ever acted in that capacity.

The evident purpose of the waiver was to excuse consequential damages for subcontractor actions—which are necessarily post-Agreement. Alta Br. 29-30, 32-

6

33. The "connected" clause does not somehow expand the scope of the subcontractor class to include pre-Agreement, *non*-subcontractor actions merely because fraudulently inducing conduct is (in a perverse way) connected to the Agreement.

**C.** Perhaps most jarring is GE's treatment (at 36-37) of *Finley Resources Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332 (Tex. 2023) (discussed at Alta Br. 30-31). *Finley* confronted a complicated conveyance where Headington released Petro Canyon and its "predecessors" from liability. *Id.* at 337. The question was whether the release covered Finley, who had just sold its interests to Petro Canyon. *Id.* Finley was literally a "predecessor" in the sense that it previously owned the land, and the dispute was "related in any way to the Loving County tract," as the release stated. *Id.* But the Court held that the "otherwise broad and encompassing" language must be "informed by its grammatical use." *Id.* at 340, 343. And in context, "predecessor[]" connoted "a prior connection *to the corporate entities themselves*, not the land." *Id.* at 343. The same follows here: The waiver's "contractors and subcontractors" class relates to the work performed under the Agreement, not to any action taken by someone that eventually becomes a subcontractor. Alta Br. 31.

GE responds (at 36) that *Finley* "turned to context in resolving the ambiguity" of the term "predecessors." That is wrong. *See Finley*, 672 S.W.3d at 345

7

(concluding the agreement, "construed as a whole, unambiguously narrows the scope of what has the potential to be a very broad term"). Applying that teaching here, the "plain meaning of the term[s]" *subcontractors* and *connected in any way* should be "constrained by the linguistic and grammatical context in which [they were] used." *Id.* at 345. As such, a "subcontractor['s]" actions *as a* subcontractor are covered by the Agreement, but not otherwise.

GE conveniently ignores Alta's *Finley*-based hypothetical: If after losing in the Supreme Court of Texas, Finley bought shares in Petro Canyon, would it fall within the release between Headington and Petro Canyon as one of Petro Canyon's "shareholders"? Alta Br. 31; *see Finley*, 672 S.W.3d at 336 (release covers Petro Canyon's "shareholders"). Of course not. By the same token, GE cannot immunize its pre-Agreement fraud by becoming a "subcontractor" after its tortious conduct. GE's silence gives the game away.

Ignoring *Finley*'s textual lessons, GE notes that *Finley* involved a release while the Agreement here limits damages. But the same rationale that requires close examination of releases and disclaimers of reliance applies here. Releases absolve liability for past conduct and are scrutinized "to avoid unintentionally losing valuable rights against unnamed—and perhaps unknown—wrongdoers." *Finley*, 672 S.W.3d at 339. Disclaimer-of-reliance provisions that shed liability for past statements and conduct similarly must be "clear, specific, and unequivocal,"

*Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 473 (Tex. 2022), "lest we 'forgive intentional lies regardless of context,'" *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 335 (Tex. 2011) (citation omitted). Thus, while the tests for establishing third-party-beneficiary status and released-party status are "not necessarily aligned," *Finley* rejected Headington's claim that it was a third-party beneficiary to the conveyance. 672 S.W.3d at 345 ("[I]n this case there is no daylight between Finley's third-party-beneficiary and release claims."). *Finley* squarely applies.

The upshot: GE seeks to transform the Agreement's consequential-damages waiver into a backward-looking shelter for GE's past fraudulent conduct. The text is more than sufficient to reject that attempt. But GE's interpretation is doubly foreclosed by these background legal principles and the Agreement's relationship-initiating context. *See id.* (noting that a "lease agreement, as here, which is the initiation of a business relationship, should be all the more clear and unequivocal in effectively disclaiming reliance" given the context).[2]

**D.** GE's remaining arguments were not accepted by the district court and can be quickly dispatched.

---

[2] Perplexingly, GE buries its response about "disclaimers of reliance and releases" to a footnote in a different section, claiming (at 43 n.11) Alta's "focus" is "misplaced," and citing without analysis all those cases.

Start with GE's claim that Alta "repeatedly recognized that GE was WattStock's subcontractor" or "partner[]." GE Br. 33; *see also id.* at 28, 39. GE cites (at 33) Alta's district-court briefing that merely recognizes that GE became a subcontractor long after the Agreement. Then GE (at 28, 39) lists various instances when Alta referred to GE as WattStock's subcontractor, all of which post-date the Agreement. This just illustrates that Alta's position has been consistent throughout: GE became a subcontractor *after* it committed its pre-Agreement fraud, which is precisely why its conduct is not covered by the "subcontractor" limitation.

In addition, Alta's mistaken, pre-suit perception that GE was WattStock's "partner" is irrelevant to whether GE was actually its partner when it defrauded Alta. Of course Alta *thought* GE and WattStock were "partners"—both GE and WattStock falsely claimed they were. Alta Br. 14 (citing ROA.22495, ROA.21260-61). The truth came to light only after this lawsuit, when Alta discovered the GE–WattStock MOU did not bind GE to "fully wrap[ping]" the refurbished turbines as they previously claimed. *Id.* But GE's success in deceiving Alta does not transform it into a partner (or subcontractor) for its pre-Agreement actions. The dispositive

10

question is whether GE actually acted as a subcontractor when it defrauded Alta. GE offers no dispute on that point.[3]

GE pivots to another factual argument not relied upon by the district court.  It artfully contends that the "record conclusively establishes that GE's *relationship* with WattStock long predated the Master Agreement," and that "[t]he MOU established that GE *could* serve as a subcontractor to WattStock on Alta's project. *See* ROA.7871, 8056." GE Br. 38 (emphases added).  The weasel words and the *See* signal are doing a lot of work there.  The former cite is to the GE–WattStock MOU (which does not mention Alta) and the latter is to the Alta–WattStock Agreement (which does not mention GE), hence the cagey "could" language.  No one questions that GE and WattStock had an MOU before the Agreement, *see* Alta Br. 9-14, or that GE *could* serve as a subcontractor under future WattStock contracts, *see id.* at 21.  But none of this remotely establishes that GE was serving as WattStock's subcontractor when it defrauded Alta into signing the Agreement.  After all, GE's

---

[3] GE similarly cites (at 33) Alta's long-superseded, state-court petition that refers to GE as a "party" to the Alta–WattStock Agreement, but even GE recognizes that this allegation is "contrary to all record evidence."

11

nonbinding MOU with WattStock merely acknowledged that GE "may" evaluate, purchase, and install turbines to assist WattStock in unspecified transactions:

> **WHEREAS**, WS may purchase, refurbish and resale existing LM2500 and LM6000 Gas Turbines manufactured by GE or its affiliates and their associated packages (together, "LM Package(s)) (each such purchase, refurbishment and resale, a "Transaction"); and
>
> **WHEREAS**, GE may assist WS in certain Transactions by (i) providing evaluations of the LM Package, (ii) purchasing the gas turbine(s) associated with a LM Package, (iii) providing a new or refurbished gas turbine for installation into a LM Package, iv) providing installation and commissioning supervision, and (iv) providing other parts and services for the upgrade of a LM Package, in each case, in accordance with the terms of a separately issued purchase order or purchase agreement.
>
> **WHEREAS**, this MOU is not intended to bind either Party to sell any equipment, parts or services to the other but shall only be an expression of the parties' current understanding of the Transactions and to serve as the framework for further discussions and the negotiation and documentation of definitive agreements with respect to the Transaction.

ROA.7871. And GE only became WattStock's subcontractor long after the Alta–WattStock Agreement was signed, when GE contracted to purchase and refurbish turbines related to Alta's peaker plants. *See* ROA.21068-69; GE Br. 39 (recognizing that GE and WattStock did not have a "written contractual relationship for Alta's project" until "mid-2019"). GE's actions in defrauding Alta thus predated its status as WattStock's subcontractor and were, in any case, outside any subcontracting duties it had.

GE next diverts the Court's attention (at 30-32) to additional contracts with consequential-damages waivers that the district court did not construe—specifically, two nondisclosure agreements and two purchase orders. Even taking them at face

value, GE does not explain how those waivers would apply to GE's fraudulent conduct predating the Agreement that precipitated this case.

For starters, GE did not mention its principal example—the "2020 NDA"—until its summary-judgment reply, which is likely why the district court ignored it. ROA.23704 (attached to summary-judgment reply); *see Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 99 F.4th 770, 774 (5th Cir. 2024) ("[W]hen a party raises new arguments . . . in a reply, the district court must either give the other party an opportunity to respond or decline to rely on the new arguments and evidence.").[4]  In any event, Alta is not claiming to have been fraudulently induced into the NDA and is not seeking damages for disclosure of confidential information—the substance of the 2020 NDA's waiver provision.  *See* ROA.23704. Next up, the "2018 GE–Alta NDA" was with non-party-to-this-suit GE Packaged Power LP (as was the 2020 NDA), and was about "the possibility of entering into the design, development, sale and purchase of GE CF6-8062 engines"—a totally different engine than the one at issue here.  *See* ROA.8037.  Finally, the "purchase orders" were discrete agreements between Alta and WattStock that do not mention GE or "subcontractors" of any kind.  ROA.8073, ROA.8083.

---

[4] Alta moved to strike this from GE's reply, or alternatively allow a sur-reply, and the district court denied Alta's motion as "moot" because the court did not address the 2020 NDA.  *See* ROA.23859.

13

GE later claims (at 38-39) that Alta "twice reaffirmed the waiver" in follow-up agreements. The district court addressed neither. The first was an unrelated amendment to the Alta–WattStock Agreement that does not mention anything about the consequential-damages waiver. ROA.21075-76. The second was the aforementioned 2020 NDA from long after the Alta–WattStock Agreement. ROA.23701-04. GE's faulty premise appears to be that Alta "reaffirmed" the waiver *after* GE became WattStock's subcontractor, so it is as if GE were already a subcontractor when Alta and WattStock bargained for the Agreement's consequential-damages waiver. This reaffirmation is both imaginary and irrelevant—what matters is the timing and capacity of GE's actions *when it defrauded Alta*. GE's fraud unquestionably occurred before GE and WattStock had any binding contractual relationship. And GE could not have acted as WattStock's subcontractor before then.

GE's consequentialist arguments fare no better. According to GE (at 35), Alta's interpretation renders the consequential-damages waiver a "dead letter" because parties could creatively plead that those who breach acted outside of their capacities in the contract. But parties need not worry—they are squarely covered solely by virtue of being parties to the contract. And Texas law already makes it difficult for non-parties like GE to obtain "the benefits and burdens of a contract," which generally "belong solely to the contracting parties." *First Bank v. Brumitt*,

14

519 S.W.3d 95, 102 (Tex. 2017). If a non-party claims entitlement to a contract's benefits solely because of its relationship to a party (say, as the party's "subcontractor"), requiring it to establish that it acted pursuant to that status fits comfortably within the non-party's "heavy burden" of establishing "third-party beneficiary status." *See Mo. Pac. R.R. Co.*, 26 F.3d at 540.

It is the district court's interpretation that has untenable results under Texas law. Under that interpretation, WattStock had unilateral authority to absolve any wrongdoing that led to the Agreement simply by hiring the wrongdoer after the fact. The hypotheticals write themselves. Suppose WattStock enlists a hacker to steal Alta's strategy for negotiating the Agreement. WattStock later hires the hacker to do IT work relating to the database of used turbines. The hacking, by WattStock's newest "subcontractor[]," is now retroactively covered under GE's interpretation. GE's approach contravenes the text, context, and common sense.

*

The district court misinterpreted the Alta–WattStock Agreement to retroactively immunize GE's fraudulent conduct. This Court should reverse.

**II.  The Alta–WattStock Agreement's fraudulently induced consequential-damages waiver is not enforceable under Texas law, especially not by third-party GE.**

The district court further erred in concluding that, under Texas law, a party can fraudulently induce a waiver of consequential damages flowing from its fraud.

15

The mistake was understandable—GE devoted just one footnoted sentence in its summary-judgment motion to it—but nevertheless reversible.

**A.** Two decades before Texas's current Constitution was enacted, the Supreme Court of Texas said that "[n]othing can be better settled than that fraud vitiates every contract, and may consist either in misrepresentation or in concealment." *Wintz v. Morrison*, 17 Tex. 372, 383 (1856). The Latin-rooted maxim persists to this day. *See Italian Cowboy*, 341 S.W.3d at 336 ("*Fraus omnia corrumpit*: fraud vitiates everything it touches."). Only in rare and specific circumstances does that rule give way. Alta Br. 34-35 (discussing releases of liability and disclaimers of reliance); *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 232-34 (Tex. 2019) (enforcing punitive-damages waiver in limited circumstances).

According to GE (at 40 n.8), that long jurisprudential history is "beside the point" after *Bombardier*'s statement that the Supreme Court of Texas has "never held . . . that fraud vitiates a limitation-of-liability clause." GE Br. 40 (quoting *Bombardier*, 572 S.W.3d at 232). By ignoring the background legal principle, however, GE misreads *Bombardier* as a massive sea change rather than a narrow exception. After all, *Bombardier* itself reiterated the general rule that "fraud vitiates whatever it touches." 572 S.W.3d at 232 (citation omitted). The Court then gave

16

several reasons why, despite the general rule, it would enforce a narrow limitation on punitive damages:

1. Plaintiffs were trying to strike the punitive-damages limitation while otherwise enforcing the agreement;

2. As in *Italian Cowboy*, these were "sophisticated entities represented by attorneys in an arms-length transaction" that "bargained for the limitation-of-liability clauses to bar punitive damages";

3. "[N]owhere d[id] the provisions at issue, read as a whole, limit actual damages," and thus

4. "In balancing the competing interests between protecting parties from 'unintentionally waiving a claim for fraud' and 'the ability of parties to fully and finally resolve disputes between them,'" the Court said it "believe[d] parties can bargain to limit exemplary damages."

*Id.* at 232-33 (quoting *Italian Cowboy*, 341 S.W.3d at 332).

None of the reasons for creating an exception in *Bombardier* applies here: (1) Alta is not trying to enforce any aspect of the Alta–WattStock Agreement against GE; (2) Alta did not bargain with GE over the consequential-damages waiver because GE was not a party to the Agreement; (3) GE attempts to invoke the Agreement's waiver to limit actual damages; and thus (4) the interest-balancing— between "protecting parties from 'unintentionally waiving a claim for fraud'" and allowing parties to finally resolve disputes between them—cuts drastically in favor of the general rule, not the exception.  GE's fraud thus vitiates the waiver.

**B.**     GE misreads *Bombardier* by ignoring its rationale.  Take GE's claim (at 42) that it "does [not] matter that in *Bombardier* both parties [to the lawsuit] were signatories to the contract."   *Bombardier* says otherwise at least three times, emphasizing the bargain between the contractual parties.   *E.g.*, *id.* at 232 ("Bombardier and the purchasing parties—sophisticated entities represented by attorneys in an arms-length transaction—bargained for the limitation-of-liability clauses.").  Indeed, *Bombardier*'s "freedom of contract" component is grounded in the *parties*' ability to limit their punitive-damages exposure.  *Id.* at 233 ("Under our strongly held principles of freedom to contract, we hold that the limitation-of-liability clauses are valid limited warranties *that were the basis of the parties' bargain*." (emphasis added)).[5]  Of course, "freedom of contract" is fundamentally important in Texas law; but like all freedoms, "that freedom has limits."  *See Zachry Constr. Corp. v. Port of Hous. Auth. of Harris Cnty.*, 449 S.W.3d 98, 116 (Tex. 2014).  Because a contract is between parties, contractual freedom does not extend to limiting actual damages for fraud by non-parties.

Or consider GE's insistence (at 42) that *Bombardier*'s *punitive*-damages waiver does not materially distinguish it from the *consequential*-damages waiver

---

[5] GE emphasizes (at 1, 19, 21, 25, 32, 56) that Alta and WattStock were "sophisticated" parties, missing *Bombardier*'s point that *the parties* in the case bargained for the punitive-damages waiver that one *party* sought to enforce.

18

here. Wrong again: The Court emphasized the distinction at every turn. *Id.* at 230 ("Exemplary, or punitive, damages are not compensatory and are designed to punish the defendant . . . ."); *id.* at 232 ("[W]e believe parties can bargain to limit exemplary damages."); *id.* at 233 ("Here, nowhere do the provisions at issue, read as a whole, limit actual damages."). *Bombardier* specifically "reason[ed] that the punitive damages waiver was enforceable" because the waiver did not "prevent the buyer from recovering compensation for its injury." *Preston Hollow Cap., LLC v. Truist Bank*, No. 25-BC01B-0030, 2025 WL 3716371, at *9 (Tex. Bus. Ct.—Dallas Dec. 19, 2025); *see id.* (enforcing punitive-damages waiver because it "does not deprive [plaintiff] of its non-punitive remedies"). That the provision in *Bombardier* also mentioned consequential damages gets GE nowhere. GE Br. 42. The Court did not analyze consequential damages at all because they were not at issue.

GE cites three cases (at 40-41) for the proposition that "courts in Texas routinely" enforce consequential-damages waivers "over allegations of fraud." Three unpublished opinions in six years hardly makes a routine. Those cases are easily distinguishable in any event. In all three, the dispute was between the two parties to the damages waiver, and all agreed that was a key component of

19

*Bombardier*.[6] Here, GE was not a party to the Agreement and did not bargain for the consequential-damages limitation.

In *Pizza Hut*, moreover, the plaintiffs were simultaneously seeking actual damages under the contract, meaning they were trying to "both have [the] contract and defeat it too." *Bombardier*, 572 S.W.3d at 232 (citation omitted). Here, Alta is not seeking damages against GE under the Agreement or trying to enforce the Agreement in any way.[7] And in *Great Hans*, the court had already determined that there was no fraud, so "the foundation" for the argument about *Bombardier* "no longer exist[ed]." *Great Hans*, 2019 WL 1219110, at *9 (noted in Alta Br. 38 n.7). Because GE was not at the bargaining table, and because Alta is not trying to have it both ways, these cases do not help GE.[8]

---

[6] *BigCommerce, Inc. v. Cover Genius Warranty Servs., LLC*, 1:23-CV-298-DAE, 2025 WL 1270110, at *10 (W.D. Tex. Feb. 27, 2025) ("In *Bombardier*, as here, 'sophisticated entities represented by attorneys in an arms-length transaction— bargained for the limitation-of-liability clauses to bar punitive damages.'"); *Pizza Hut, LLC v. Ronak Foods, LLC*, No. 5:21-CV-00089-RWS, 2022 WL 20564482, at *12 (E.D. Tex. Feb. 10, 2022) (same); *Great Hans, LLC v. Liberty Bankers Life Ins. Co.*, No. 05-17-01144-CV, 2019 WL 1219110, at *9 (Tex. App.—Dallas Mar. 15, 2019, no pet.) (same).

[7] GE claims (at 42) that "Alta *did* previously try to enforce the Master Agreement against both WattStock and GE," and thus *Bombardier* still applies. The "previously" there is dispositive. In *Bombardier*, the plaintiffs were *presently* attempting to enforce the contract, 572 S.W.3d at 232; here, Alta's live complaint presses fraud claims against GE and does not raise contractual claims.

[8] At the very least, these cases should be not deemed authoritative on the meaning of *Bombardier*. *Bombardier* was decided after argument in *Great Hans*

Neither GE nor the district court appreciated the nuance and interest-balancing that *Bombardier* applied, and neither recognized the fundamental principles of Texas law that undergird *Bombardier*. The result: GE is the first contractual non-party in Texas history to benefit from a fraudulently induced consequential-damages waiver. This Court has a "longstanding rule against front-running the state courts by adopting innovative theories of state law." *Hux v. S. Methodist Univ.*, 819 F.3d 776, 783 (5th Cir. 2016); *TIG Ins. Co. v. Aon Re, Inc.*, 521 F.3d 351, 361 (5th Cir. 2008) ("We will not expand state law beyond its presently existing boundaries."). The Court should therefore reverse.

## III. The Alta–WattStock Agreement does not limit consequential damages for GE's intentional torts.

The district court likewise erred by refusing to recognize that Texas law draws a significant distinction between intentional and unintentional torts when it comes to liability limitations. Section 9.1(B) bars consequential damages for "any cause of action including negligence, strict liability, breach of contract and breach of strict or implied warrantee." ROA.21270. Those are all *un*intentional wrongs. And the

---

and thus was never briefed, and in *BigCommerce* and *Pizza Hut*, the opposing party never addressed *Bombardier*. Dkt. 37 at 11, *BigCommerce*, No. 1:23-CV-00298-DAE (W.D. Tex. Aug. 2, 2024) (summary-judgment reply citing *Bombardier* for the first time); Dkt. 225 at 8, *Pizza Hut*, No. 5:21-CV-00089-RWS (E.D. Tex. Oct. 28, 2021) (motion-to-dismiss reply noting that "Defendants do not even try to grapple with *Bombardier*").

inclusion of those terms implies the exclusion of others—namely, intentional torts like GE's. Alta Br. 41-43 (citing *City of Austin v. Powell*, 704 S.W.3d 437, 453 (Tex. 2024)).

This principle applies where it is "fair to suppose that [the drafters] considered the unnamed possibility and meant to say no to it." *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 429 (Tex. 2017) (citation omitted). And Alta explained it was indeed fair to suppose that Alta and WattStock did not intend to waive consequential damages for intentional torts, given that "exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy." *Zachry*, 449 S.W.3d at 116.

GE again puts on its hyper-literal blinders in response. GE Br. 43-48. Its first response is to repeat (in various ways) that "any" is broad and all-encompassing. True enough—stripping away all other words and context, "any" is a broad term. But "any cause of action" is followed by "including" and a list of specific causes of action, all sharing one quality: They are unintentional wrongs. In such instances, capacious words like "any" can be limited by the words that follow it. *See First Nat'l Bank of Luling v. Nugent*, 384 S.W.2d 224, 226 (Tex. App.—San Antonio 1964, writ ref'd n.r.e.).

Moreover, Alta explained that the use of "including" in Section 9.1(B)—as opposed to "including but not limited to" used in a different list in Section 9.1(B)—

shows that the "including" language was more restrictive. Alta Br. 42-43 (citing *Great Lakes Ins., S.E. v. Gray Grp. Invs., L.L.C.*, 76 F.4th 341, 347 (5th Cir. 2023)). GE fairly recognizes (at 45-46) that, in general, "including" is meant to be illustrative and not limiting. But this is counterbalanced by the presumption of consistent usage—*i.e.*, using "including but not limited to" in one breath and "including" in the next indicates a different meaning for the narrower term. Alta Br. 42-43. And when GE finally addresses that point, it completely begs the question (at 47)—"Alta's reliance on the canon of consistent usage" "is misplaced given that 'shall include, but is not limited to' is a belt-and-suspenders phrase that means the same thing as 'including.'" None of GE's authorities, however, deals with a situation of inconsistent usage in the same subsection, much less where background legal principles against excusing intentional torts suggest a narrower meaning for the "including" clause.

GE next seeks to distinguish Alta's cases on their facts without confronting the underlying principles. Take *Zachry*. Alta cited it for the proposition that "Texas law recognizes a significant distinction between waivers of negligence versus intentional torts" that must inform the proper interpretation of Section 9.1(B). Alta Br. 44 (citing *Zachry*, 449 S.W.3d at 117). GE brushes *Zachry* aside because it "concluded that 'pre-injury waivers of future liability' were 'unenforceable on grounds of public policy,'" and "[t]hat's not the case with the consequential-

23

damages waiver here." GE Br. 46. That ignores Alta's point: The district court gave short shrift to the legally significant differences between waivers of intentional-tort liability and waivers of non-tortious wrongs.

Next is *Waak*. Alta cited it for the proposition that where "any person" was followed by "including" and a list, the "including" language and the list limited the capacious "any person" language. Alta Br. 43 (citing *Waak v. Rodriguez*, 603 S.W.3d 103, 108 (Tex. 2020)). GE responds (at 46-47) that "the term 'including' appeared nowhere in the statutory provision at issue," and that *Waak* did not "h[o]ld" "that the word 'including' should be construed narrowly even when it follows expansive language like 'any claim' or 'any cause of action.'" Not so.

In *Waak*, the statute covered "any person, *including* a farm animal activity sponsor[,] farm animal professional," "livestock producer, livestock show participant, or livestock show sponsor." 603 S.W.3d at 109 (emphasis added). The Court explained that while "the categories following 'including' cannot be read as exclusive," "neither can they be read as meaningless." *Id.* "[T]he examples show the types of persons meant by 'any.'" *Id.* The majority thus reasoned that "any person" does not include *literally* any person, but instead smaller subclasses related to the examples, *id.*, precisely as Alta contends that "any cause of action" is limited to non-intentional wrongs by the examples that follow it. The *Waak* dissent faulted the majority for treating "including" as exclusive and improperly narrowing the

24

meaning of "any person," *id.* at 114 (Blacklock, J., dissenting), just as GE (at 45-48) faults Alta here. But as the saying goes, "the dissent clearly tells us what the law is not." *See Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 978 (5th Cir. 2019) (Oldham, J., dissenting).

✲✲

GE's myopic focus on the word "any" plagues its response to Alta's arguments. The district court did not grapple with these arguments, and thus fell prey to a hyper-literal, acontextual reading of the provision. Because it misapplied Texas law, the district court's summary judgment must be reversed.

## IV. The Court should decline to address—or reject—GE's alternative grounds for affirmance.

GE spends a large portion of its brief defending the judgment on grounds not reached by the district court. GE Br. 49-56. The Court should not address GE's alternative arguments. As this Court often says, it is "a court of review, not first view." *In re Adair*, 137 F.4th 384, 389 n.1 (5th Cir. 2025) (applying this principle where the remaining issues "[were] sufficiently contestable to warrant adversarial proceedings in the first instance in the court below"). "This cautionary [review-not-first-view] refrain has especial force when a potential alternate ground for affirmance involves a 'fact intensive' summary judgment record, as it does here." *Zaragoza v. Union Pac. R.R. Co.*, 112 F.4th 313, 322-23 (5th Cir. 2024). With a 25,000-page record on appeal, and stark disagreements over the material facts found

therein, *see* GE Br. 52-53 (debating the disputed facts in the alternative-arguments section), addressing GE's tag-along arguments at this juncture would be inappropriate. *Lone Star Nat'l Bank, N.A. v. Heartland Payment Sys., Inc.*, 729 F.3d 421, 427 (5th Cir. 2013). In any event, GE's matter-of-law arguments fail.

*First*, Alta's lost-profits damages are not speculative and must be decided by a jury. ROA.21218-34. Awards for lost profits must be established with reasonable certainty. "The requirement of 'reasonable certainty' in the proof of lost profits is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." *Tex. Instruments v. Teletron Energy Mgmt.*, 877 S.W.2d 276, 279 (Tex. 1994). "What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 279 (Tex. 2015) (citation omitted). Here, the nature of Alta's business model makes Alta's lost profits calculable with a level of precision that exceeds the Texas Supreme Court's "flexible" and "fact intensive" reasonable-certainty requirement. ROA.21221-25 (summarizing the evidence).

GE's critiques reveal why this question should be resolved by a jury (or at the very least, by the district court in the first instance). GE argues that Alta's peaker-plant project is an "untested venture," and that Texas law prevents lost-profit damages on "new and unproven" enterprises. GE Br. 51 (quoting *Am. Midstream (Ala. Intrastate), LLC v. Rainbow Energy Mktg. Corp.*, 714 S.W.3d 572, 584 (Tex.

26

2025)). But GE's theory (at 52) depends on a court adopting its factual contentions wholesale—that Alta would never obtain financing or be able to build the peaker plant. Alta produced significant evidence that peaker plants are not novel, that four of Alta's executives had already successfully built peaker plants in Texas, and that other companies (using ProEnergy) financed and built plants in this time period. ROA.21221-29. Alta's calculated damages were based on actual market data and reasonable assumptions supported by objective record evidence. ROA.21222, ROA.21229-34. That is more than enough to survive summary judgment.[9]

*Second*, the statute of frauds has nothing to do with this case. Alta is not asserting that GE breached any contract. ROA.7698-7704 (asserting non-contractual fraud and fraudulent-inducement claims, among others); *see Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 641 (Tex. 2013) ("The statute of frauds generally renders a contract that falls within its purview unenforceable."). GE declares (at 54) that "Alta's entire case rests on two alleged oral promises: (1) to deliver nine TruePackage units for $10 million or less, and (2) to assume WattStock's outstanding contractual obligations if WattStock defaulted." That is wrong. Alta's fraud claims allege that had GE not made those misrepresentations, Alta would not

---

[9] GE's reliance on *American Midstream* is misplaced given that the Court was reviewing a bench-trial judgment, rather than summary judgment. *Am. Midstream*, 714 S.W.3d at 577-78.

"have entered into the Master Agreement (or any other agreement) with WattStock, nor would it have wired WattStock a single dollar" had GE "been honest about the pricing and availability of units and its relationship with WattStock." ROA.2053, ROA.2059. Thus, Alta does not seek the benefit of the Alta–WattStock Agreement or GE's so-called oral promises.[10] *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998) ("[A] fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract."). Consequently, GE's statute-of-frauds argument fails.

**\*\***
**\*\***

This Court should not wade into these untested waters in the first instance. The district court is well-equipped to address them on remand, so the Court should reject GE's alternative attempts to salvage summary judgment.

---

[10] Alta's "vicarious-liability and civil-conspiracy theories" are not premised solely on "WattStock's 'breaches,'" *contra* GE Br. 15, but also on "WattStock's tortious conduct." ROA.7698.

## CONCLUSION

The Court should reverse the district court's judgment in full, hold that the consequential-damages waiver does not cover Alta's claims against GE, and remand for further proceedings.

Dated: February 25, 2026

Respectfully submitted,

/s/ Aaron M. Streett

John B. Lawrence
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
john.lawrence@bakerbotts.com

Michael Cancienne
Joseph W. Golinkin II
JORDAN, LYNCH & CANCIENNE PLLC
1980 Post Oak Boulevard
Houston, Texas 77056
(713) 220-4019
mcancienne@jlcfirm.com
jgolinkin@jlcfirm.com

Aaron M. Streett
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com
beau.carter@bakerbotts.com

*Counsel for Alta Power, LLC*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,301 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.  This brief was scanned for viruses and none were present.

*/s/ Aaron M. Streett*
Aaron M. Streett

## CERTIFICATE OF SERVICE

I certify that on February 25, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ Aaron M. Streett*
Aaron M. Streett